**In re Joseph N. PELUSO, Jr., Debtor.**

**Bankruptcy No. 86–00145.**

United States Bankruptcy Court, N.D. New York.

April 3, 1987.

Allan J. Bentkofsky, Auburn, N.Y., for debtor.

Kim F. Lefebvre, Estate Administrator U.S. Bankruptcy Court N.D.N.Y., Utica, N.Y.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

Pursuant to § 707(b) of the Bankruptcy Code, 11 U.S.C. §§ 101–151326 ("Code"), the Estate Administrator initiated a hearing to dismiss the filing of the Chapter 7 petition for relief of Joseph N. Peluso, Jr. ("Debtor"). An evidentiary hearing was held on November 18, 1986, with the parties afforded the opportunity to present evidence and cross examine. An opportunity to submit memoranda was also provided.

The following is promulgated pursuant to Fed.R.Bankr. P. 7052 and 9014.

### FINDINGS OF FACT

On February 6, 1986, Debtor filed his individual petition for relief under Chapter 7. Debtor's "Schedule of Current Income and Current Expenditures" filed with his petition listed monthly take-home pay of Two Thousand ($2,000.00) Dollars, and the following expenditures:

| | |
|---|---:|
| Rent or home mortgage payment | $ 250.00 |
| Utilities: | |
|   Heat | 120.00 |
|   Telephone | 60.00 |
| Food | 320.00 |
| Clothing | 50.00 |
| Laundry and cleaning | 20.00 |
| Medical and drug expenses | 30.00 |
| Insurance: | |
|   Auto   $400.00 (yearly) | |
|   Other   $288.00 and $51.00 (yearly) | 61.00 |
| Transportation | 250.00 |
| Recreation | 100.00 |
| Dues, union, professional, social or otherwise (not deducted from wages) | 16.50 |
| Delinquent New York State taxes | 100.00 |
| Additional union dues | 35.00 |
| | $1,416.50 |

Noting the $587.50 in potential disposable income which could be used to fund a Chapter 13 plan paying all Debtor's creditors in excess of Sixty Percent (60%) of obligations owed, the Estate Administrator

requested clarification on some of the expenditures listed.

Discussions between Debtor's counsel and the Estate Administrator continued until Debtor filed an Amended Schedule of Income and Expenditures on September 23, 1986. Income remained at Two Thousand ($2,000.00) Dollars, with expenditures modified to reflect the following:

| | | |
|---|---|---|
| Rent or home mortgage payment | $ 275.00 | ( + $25.00) |
| Utilities: | | |
|   Heat | 150.00 | ( + $25.00) |
|   Telephone | 140.00 | ( + $80.00) |
| Food | 320.00 | |
| Clothing | 75.00 | ( + $25.00) |
| Laundry and cleaning | 40.00 | ( + $20.00) |
| Newspaper, periodicals, and books | 15.00 | ( + $15.00) |
| Medical and drug expenses | 50.00 | ( + $20.00) |
| Insurance: | | |
|   Auto    $95.00 | | |
|   Life     $24.00 | | |
|   Tenants  $4.25 | 123.00 | ( ÷ $62.00) |
| Transportation | 250.00 | |
| Recreation | 100.00 | |
| Dues, union, professional, social or otherwise (not deducted from wages) | 51.50 | ( + $35.00) |
| Auto payment | 125.00 | ( + $125.00) |
| Allowance to daughter | 20.00 | ( + $20.00) |
| Note to Marine Midland (co-signed by Kathy Pinkney) | 187.00 | ( + $187.00) |
| | $1,921.75 | |

On October 7, 1986, Debtor filed an affidavit with the Court in opposition to the Estate Administrator's notice of hearing. Attached were two (2) recent pay stubs from his employer. For the week ending September 21, 1986, Debtor worked forty (40) hours, earning $747.60 ($18.69 per hour). He received transportation expenses of $15.00, and a second shift premium of $112.14, for total gross weekly wages of $874.74. After deductions, Debtor's net weekly pay was $418.16.

Debtor's affidavit revealed he was employed by the Stone & Webster Engineering Corporation as a painter at the Nine Mile Point Nuclear Station—Unit 2, Oswego, New York. He generally works forty (40) hours per week and while hours are not guaranteed, there is occasional overtime. A shift premium of 15% of total wages is paid for the "night shift", and Debtor had worked all three (3) shifts in the past. Four percent (4%) of his gross wages are deducted for union dues, with an additional one percent (1%) per hour deducted for a union benefit fund.

As of September 28, 1986, Debtor had earned gross wages of $35,800.94 (an average weekly gross of $917.97). Debtor asserted his average weekly net wage to be $548.00. For federal income tax purposes, Debtor claims exemption as married with two (2) dependents. Debtor is single with one child living at home.

At the hearing, Debtor submitted an additional pay stub from his employer for the week ending November 9, 1986. Gross wages of $700.88 (37.50) hours and a transportation subsidy of $15.00 were received for a total gross of $715.88. After deductions, Debtor's net pay was $473.10. Debtor's year-to-date figures revealed gross earnings of $40,651.11.

Debtor testified that his scheduled debts were personal obligations, not arising from the transaction of any business for profit. The changes in monthly expenditures were explained as follows. His rent had increased by $25.00 per month at some unspecified time after the filing of his petition. Debtor's heating bill obligation was delinquent at the time he filed, and he was consequently removed from a budget payment plan.

The $80.00 increase in monthly telephone expenses was attributed to the fact that Debtor had voluntarily given his son a telephone credit card for the latter's personal use. Debtor's son, an adult in military service stationed at Fort Bragg, North Carolina, was said to telephone home "alot," and also use the telephone credit card to place long distance telephone calls to his girlfriend and his mother, the latter residing in Florida. Debtor's daughter, presumably a minor, also placed long distance telephone calls to her mother. The original figure of $60.00 per month was a "guess," as Debtor did not check the numbers.

Similarly, Debtor testified that he had originally "guessed" at his monthly laundry and cleaning expenses, as well as monthly medical and drug expenditures. Concerning the latter changes, Debtor testified that his daughter was on birth control pills, and that he was on a regular

prescription for an unspecified medical condition which arose at an unspecified time after the filing.

As to the increase in monthly automobile insurance fees, Debtor revealed that six (6) to seven (7) months prior to the hearing, he began paying his adult son's insurance premium, which added approximately $740.00 to his total yearly obligation.

Debtor testified that his monthly transportation expenses of $250.00 were largely attributable to the nearly 100 miles he commuted per day. Debtor owns a 1982 Chevette with 108,000 miles; the Debtor had recently incurred unanticipated automobile repair expenses in the amount of $256.38, and purchased tires in the amount of $170.00. Debtor stated his monthly transportation figure did not provide for such unexpected expenses and routine maintenance.

At the time of filing, Debtor was in default on a secured obligation to the Key Bank of Central New York, for which his automobile served as collateral. Debtor later "reaffirmed" this obligation, thus leading to the inclusion of the $125.00 monthly payment on his Amended Statement of Expenditures. No evidence was presented as to the automobile's value.

Debtor "forgot" to list the $187.00 monthly payment to the unsecured Marine Midland Bank when he initially filed his petition. Debtor had originally borrowed Five Thousand ($5,000.00) Dollars, and Cathy Pinkney, a friend, co-signed the note. Debtor has always kept the obligation current to avoid having Pinkney bear any expense.

As additional monthly expenses, never listed previously but present at the time of filing, Debtor noted a $30.00 monthly cable television obligation, as well as $97.00 for cigarettes. The latter expense is not included in Debtor's monthly food expenses. The addition of these expenses to those previously amended bring Debtor's claimed expenses to $2,048.75; this figure exceeds his average net income.

In Schedule A–1, Debtor disclosed Four Thousand ($4,000.00) Dollars in taxes owing to the United States, and Two Thousand ($2,000.00) Dollars in taxes owing to the State of New York.

In Schedule A–2, Debtor indicated a secured claim in the amount of Five Thousand ($5,000.00) Dollars, with a 19–foot Sea Ray inboard/outboard boat serving as collateral. The obligation on the automobile was also scheduled, with the total on Schedule A–2 for creditors holding security listed at Seven Thousand Five Hundred ($7,500.00) Dollars.

In Schedule A–3, Debtor disclosed unsecured claims of Fifteen Thousand Six Hundred Seventy-Five ($15,675.00) Dollars.

Schedule B–2 indicated personal property worth Seven Thousand Eight Hundred Twenty-Five ($7,825.00) Dollars.

In Schedule B–4, Debtor claimed as exempt, household furnishings worth One Thousand Three Hundred ($1,300.00) Dollars, clothing worth Twenty-Five ($25.00) Dollars, the automobile worth Two Thousand Five Hundred ($2,500.00) Dollars, and his 1985 income tax refund with an unknown value.

## CONCLUSIONS OF LAW

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and § 157(a) and (b)(2)(A), as well as Code § 707.

■ The Court doubts there is another provision of the 1984 amendments to the Code which has generated as much procedural and substantive confusion as Code § 707(b). This section provides:

> After notice and a hearing, the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

Six (6) salient features of this section are evident:

1. Notice and hearing must precede any court activity.

2. The motion for Code § 707(b) relief issues *sua sponte* from the Court.

3. The Court's motion must be initiated without involvement of a party in interest.

4. The case to be dismissed must involve primarily consumer debts.

5. The provisions of Chapter 7 would be substantially abused were the debtor afforded bankruptcy relief.

6. The debtor is presumed susceptible to the relief he or she seeks.

The United States Supreme Court has yet to approve the amended Bankruptcy Rules promulgated by the Advisory Committee of the Judicial Conference of the United States. Consequently, while the Rules as proposed provide for Code § 707(b) procedural guidelines,[1] the present matter has arisen without benefit of a standardized, formal structure; the Estate Administrator notified the Debtor and Trustee that a hearing would be held before the Court to determine whether the granting of relief sought by Debtor under Chapter 7 would be a substantial abuse of that chapter, thereby warranting dismissal of the Debtor's petition. The Court believes this procedure, akin as it were to a process wherein the debtor would be required to "show cause" why his petition should not be dismissed, properly balances the Court's dual role as both adducer and arbitrator. While the "show cause" procedure has been adopted by other courts, *See Central National Bank of Woodway-Hewitt v. Spark,* 61 B.R. 285, 287 (W.D.Tex.1986); *In re White,* 49 B.R. 869 (Bankr.W.D.N.C. 1985); *In re Bryant,* 47 B.R. 21 (Bankr.W. D.N.C.1984), the present process, initiated by the Court under the direction and auspices of the Estate Administrator, is similarly acceptable. *In re Deaton,* 65 B.R. 663, 664 (Bankr.S.D.Ohio 1986). The Court ventures that perhaps the present procedure is less likely to suffer from any perceived constitutional defect than one shouldering a debtor with the burden of going forward with evidence.[2]

Second, there has been no question raised that Debtor's scheduled liabilities are primarily consumer debts, incurred as they were "primarily for personal, family or household purposes." Code § 101(7).[3]

Third, the Court must consider whether the granting of Chapter 7 relief to the Debtor would constitute a "substantial abuse" of the Chapter's provisions. The term has been variously defined, with an "ordinary, everyday meaning" adopted in *In re White, supra,* 49 B.R. at 873,[4] and *In re Bryant, supra,* 47 B.R. at 24. A standard dictionary definition has also been applied. *In re Edwards,* 50 B.R. 933, 936 (Bankr.S.D.N.Y.1985).[5] Yet a better rea-

---

1. The Advisory Committee proposed amending Fed.R.Bankr.P. 1017 by adding a new subdivision (e):

    (e) DISMISSAL OF INDIVIDUAL DEBTOR'S CHAPTER 7 CASE FOR SUBSTANTIAL ABUSE. An individual debtor's case under Chapter 7 may be dismissed for substantial abuse only after a hearing on notice to the debtor and the trustee and such other parties in interest as the Court directs. The notice shall advise the debtor of all matters which the Court will consider at the hearing.
    "PART II: Proposed Amendments to the Bankruptcy Rules and Promulgated Amendments to the Official Forms," Bankr.Serv.L.Ed., Current Awareness Alert, p.55 (No. 8, December, 1986).

2. The case of *In re Keniston,* 60 B.R. 742, 744–45 (Bankr.D.N.H.1986) raises five (5) questions regarding the constitutionality of Code § 707(b). The court declined, however, to rule on the issues it raised as the parties before it had not questioned the section's constitutional foundation.

3. "[T]o be a consumer debt within the meaning of § 101(7) the liability must have been acquired first and foremost to achieve a personal aim or objective." *In re White, supra,* 49 B.R. at 872.

4. "Implicit in this term is some type of an unfair advantage that is obtained by the Debtor because of his filing as against his creditors." *In re White, supra,* 49 B.R. at 875.

5. "The term 'abuse' has been defined as:

    To make excessive or improper use of a thing, or to employ it in a manner contrary to the natural or legal rules for its use; to make an extravagant or excessive use, as to abuse one's authority. Black's Law Dictionary (1968).

    The term 'substantial' includes among its meanings real, not seeming or imaginary, that of moment or important. See Webster's New International Dictionary (2d Edition)." *In re Edwards, supra,* 50 B.R. at 936.

soned approach reviews the attendant legislative history in order to glean the congressional intent behind enactment. *In re Kress*, 57 B.R. 874, 877 (Bankr.D.N.D. 1985); *In re Grant*, 51 B.R. 385, 389 (Bankr.N.D.Ohio 1985).

Thorough review and discussion of what little legislative history there is to Code § 707(b) is set forth in both *In re Grant* and *In re Edwards*, with little purpose served through present reiteration. In sum, the section was aimed at reducing

the number and amount of consumer debts which are annually discharged by debtors who are able to repay a significant portion of their debts, yet continue to guarantee the truly needy a "fresh start". This would serve the ultimate goal of reducing the cost of consumer credit to the lower and middle income recipients who now bear the burden. The truly needy will be given the "fresh start" envisioned by the 1978 Act, yet the abusers will be denied a "head start".

*In re Grant, supra,* 51 B.R. at 392; *See generally In re Edwards, supra,* 50 B.R. at 936–39. The denial of bankruptcy relief due to a Debtor's failure to utilize future income for payment of pre-petition obligations appears at first blush to run contradictory to the legislative history of Code § 707 in specific,[6] and the foundations of the federal insolvency structure in general. The long standing rationale for a bankruptcy discharge was well stated by the United States Supreme Court:

The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage-earner there is little difference between not earning at all and

earning wholly for a creditor.... The new opportunity in life and the clear field for future effort, which is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.

*Local Loan Co. v. Hunt,* 292 U.S. 234, 245, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *See Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–11, 29 L.Ed.2d 233 (1971) and cases cited therein.

Yet since enactment of the 1984 amendments, courts have sought to accommodate the Code's emphasis on a "fresh start" for the debtor, with the disquieting realization that use of Chapter 7 by certain debtors strains equity to a breaking point. As expressed in *In re Hudson*, 56 B.R. 415, 419 (Bankr. N.D.Ohio 1985):

It is well established that the provisions of Chapter 7 were intended to afford relief to a debtor when he finds himself in financial circumstances which threaten his immediate well-being. [citation omitted] If a debtor has the ability to repay all or a substantial portion of his debts within a reasonable time, while at the same time maintaining a reasonable standard of living, then he cannot be so financially destitute that his immediate welfare is in question. In the absence of such jeopardy, it is morally and legally unconscionable that a person should be able to extinguish his obligations without first making a reasonable effort to fulfill them.

Consequently, a set of criteria to be considered for purposes of Code § 707(b) has slowly evolved. The recent cases of *In re Kress, supra,* 57 B.R. at 878 and *In re Gaukler,* 63 B.R. 224, 225 (Bankr. D.N.D. 1986) have synthesized the following con-

---

**6.** "[Section 707] does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory Chapter 13, in lieu of the remedy of bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 94 *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5880; H.R.Rep. No. 595, 95th Cong., 1st Sess. 380, *reprinted in* 1978 U.S. Code Cong. & Ad.News. 5963, 6336.

siderations, against which the facts of a particular case are to be assessed:

(1) whether the debtors have a likelihood of sufficient future income to fund a Chapter 13 plan which would pay a substantial portion of the unsecured claims;

(2) whether the debtor's petition was filed as a consequence of illness, disability, unemployment or some other calamity;

(3) whether the schedules suggest the debtors incurred cash advances and consumer purchases in an excess of their ability to repay them;

(4) whether the debtors' proposed family budget is excessive or extravagant; and

(5) whether the debtors' statement of income and expenses is misrepresentative of their true financial condition.

*See In re Grant, supra; In re White, supra; In re Bryant, supra; see also In re Shands*, 63 B.R. 121, 124 (Bankr. E.D. Mich.1985) (look to ability to pay 100% coupled with egregious circumstances); *In re Hudson, supra*, 56 B.R. at 419–20 (recites seven threshold considerations).

█ Viewing the evidence in the light most favorable to the Debtor within the structures of the above criteria, the Court concludes Debtor's Chapter 7 petition is to be dismissed. Debtor has altered his monthly obligations on at least three (3) occasions. While it is admittedly difficult to estimate with precision all the various expenditures a household has each month, the manner and degree to which Debtor's figures have been varied raises the degree of scrutiny the Court applies to all of the facts of Debtor's case.

Further, while Debtor has intimated that his employment, both in terms of hours and wages may not continue indefinitely, his current income is substantial. Without evidence of factors which would jeopardize this earning rate, the Court can only conclude that Debtor will continue to enjoy a standard hourly work week, at a high rate of pay.

The Court's review reveals the present case is one involving an individual who has, for whatever reason, overextended his ability to meet his current financial obligations. The filing of the Chapter 7 petition was not precipitated by a loss of employment, or some debilitating sickness or injury. Nor can the Court consider any of the obligations scheduled to be unusual or unexpected in any way. The bottom line is that Debtor voluntarily incurred consumer debts beyond his ability to pay them.

This destructive financial pattern does not appear to have an end in sight. Instead of limiting monthly expenditures, Debtor has willingly incurred additional obligations which constrict the monies which could be paid to his creditors as a whole. Debtor has graciously given his emancipated, employed son a telephone charge card, and has further consented to bear the adult son's automobile insurance. Additionally, Debtor has continued to pay close to Two Hundred ($200.00) Dollars per month on an unsecured obligation so as to protect a co-signer on a promissory note. While the Debtor may feel some moral obligation for these expenses, his creditors cannot be expected to share in any sense of personal duty. Additionally, Debtor spends close to One Hundred ($100.00) Dollars per month for his cigarette addiction. Regarding this expense, the Court will not impose its personal views as to how one should lead their life. However, the Court must consider such an expenditure to be an item of entertainment or recreation. As Debtor's budget already includes provision of One Hundred ($100.00) Dollars monthly for recreation, this additional expense is excessive. *See In re Hudson*, 64 B.R. 73, 75 (Bankr.N.D.Ohio 1986).

The Court must also note that Debtor, presumably on the advice of his counsel, continues to pay One Hundred Twenty-Five ($125.00) Dollars per month to Key Bank on the obligation secured by his 1982 automobile. While no evidence was received as to the automobile's value, the Court seriously questions whether a 1982 Chevette with 108,000 miles, driven 100 miles per day, is worth Two Thousand Five Hundred ($2,500.00) Dollars, the scheduled amount

of Key Bank's debt. The facts of this case suggest that Debtor could have possibly availed himself of Code § 722, and redeemed the automobile at a fair market value which ostensibly is less than the total of Key Bank's claim.

In any event, Debtor has excess disposable monthly income at a minimum of approximately Four Hundred Twenty-Six ($426.00) Dollars per month.[7] Using this figure, over the course of three (3) years nearly Thirteen Thousand Eight Hundred Two Dollars and Forty Cents ($13,802.40) could be disbursed to unsecured creditors. In a span of less than five (5) years, Debtor could pay off his unsecured creditors in full.[8]

While some courts have required egregious circumstances coupled with an ability to fund a 100% plan prior to finding substantial abuse, *See In re Edwards, supra,* 50 B.R. at 938; *In re Shands, supra,* 63 B.R. at 124; *In re Kress, supra,* 57 B.R. at 878, others have found substantial abuse where lesser, although substantial payment possibilities exist. *See In re Grant, supra,* 51 B.R. at 388 (68% plan possible); *In re Hudson, supra,* 64 B.R. at 75 (70% plan discussed); *In re Bell,* 56 B.R. 637, 643 (Bankr.E.D.Mich.1986) ("meaningful" part of debts may be paid).

The foregoing amply supports the Court's conclusion that Debtor's filing constitutes a substantial abuse of the Bankruptcy provisions of Chapter 7 of the Code. The Court's decision is based to a certain extent on the simple notion that a "fresh start" is a result of a bankruptcy case, not a privilege or a right summarily afforded those who file a petition and pay the filing fee. *See United States v. Kras,* 409 U.S.

434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973). It is unfair for the Debtor in this instance to have his financial obligations discharged when he has substantial disposable income which could be applied in satisfaction of those debts.

It is, consequently,

ORDERED:

1. The petition of Joseph N. Peluso, Jr., seeking relief under Chapter 7, is dismissed.

---

7. The Court has determined this figure as follows:

| | |
|---|---|
| $ 97.00 | cigarettes |
| 187.00 | payment on note to Marine Midland |
| 80.00 | telephone expense attributed to son |
| 62.00 | automobile insurance expense attributed to son |
| $426.00 | |

8.
(a) $426.00 × 12 mos. = $5,112.00
(b) $5,112.00 less Trustee's commission of 10% ($511.20) = $4,600.80