**In re Thomas G. SMURTHWAITE, Debtor.**

**Bankruptcy No. 92–50972.**

United States Bankruptcy Court, N.D. West Virginia.

Dec. 24, 1992.

Eric Frankovitch, Weirton, WV, for debtor.

Leonard Copeland, Staff Atty., Asst. U.S. Trustee, Charleston, WV, for moving party.

## ORDER

L. EDWARD FRIEND, II, Bankruptcy Judge.

On the 18th day of November, 1992, a hearing was held on the United States Trustee's Motion to Dismiss for Substantial Abuse under Bankruptcy Code § 707(b). The Court finds for the United States Trustee.

The debtor filed his Chapter 7 petition on August 19, 1992. On September 10, 1992, the United States Trustee filed its motion to dismiss for substantial abuse under Bankruptcy Code § 707(b). The debtor subsequently filed several amendments to his petition.

This Court must decide whether, pursuant to Bankruptcy Code § 707(b), it should dismiss the debtor's bankruptcy for substantial abuse. In determining whether the debtor's bankruptcy should be dismissed for substantial abuse, this Court must adhere to the totality of the circumstances test set forth by the Fourth Circuit Court of Appeals in *In re Green*, 934 F.2d 568 (4th Cir.1991). While refusing to apply a *per se* rule forcing the debtor out of Chapter 7 should such debtor have an ability to repay his debts, the court in *Green* nonetheless gave considerable weight to the debtor's ability to repay as a factor which it should consider.[1] *Id.* at 572. As well as the relation of the debtor's future income to his future necessary expenses, the court in *Green* looked to five factors to assist it in determining more accurately whether the particular debtor's case exemplifies the real concern behind § 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors. *Id.* "The debtor's relative solvency may raise an inference that such a situation exists.... [S]olvency alone is not a sufficient basis...." *Id.*

The five factors to which the court in *Green* looked were:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith.

*Id.* (*citing In re Strong*, 84 B.R. 541 (Bankr.N.D.Ind.1988); *In re Grant*, 51 B.R. 385 (Bankr.N.D.Oh.1985); and *In re Peluso*, 72 B.R. 732 (Bankr.N.D.N.Y.1987)). The court in *Green* noted that § 707(b) introduced a restraint upon a debtor's ability to gain Chapter 7 relief "by allowing a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his

---

1. The Court in *Green* seems to define the *per se* rule to state that "a debtor's possession of income in excess of his necessary expenses, standing alone, constitutes substantial abuse of Chapter 7 justifying dismissal." *Id.* at 572.

creditors." *See Green* at 570. The court noted that § 707(b) "reflects the tension between the fundamental policy concern of the Bankruptcy Code, granting the debtor an opportunity for a fresh start, and the interest of creditors in stemming abuse of consumer credit." *Id.* at 571. It further noted that § 707(b) was "intended to explicitly recognize the court's ability to dismiss a Chapter 7 petition for lack of good faith—when the total picture is abusive." *Id.* at 572. Finally, the court in *Green* suggested that in making a judgment of the question of substantial abuse, a "court may find it helpful to consult the following cases:" *Grant, supra; Peluso, supra;* and *In re Shands,* 63 B.R. 121 (Bankr. E.D.Mich.1985).

Because the court in *Green* remanded the case to the district court with instructions to return it to the bankruptcy court, the Fourth Circuit Court of Appeals did not apply its test. *See Green* at 573. Before addressing the totality of the circumstances, this Court deems it helpful to first consider the policy behind § 707(b).

The Court in *In re Grant, supra,* discussed at great length the legislative history and policy underlying § 707(b). In discussing the legislative history, the court looked to remarks made by several individual legislators. The court realized statements made by legislators are not the best indication of legislative intent, but may be considered "along with information about contemporary conditions and events, when they establish what problems or evils the legislature was trying to remedy." *See Grant* at 389 (citing 2A N. Singer, *Statutes and Statutory Construction* sect. 48.13 (4th ed. 1984) (citations omitted)). Citing various representatives' comments, the court in *Green* noted that a stated purpose for introducing the original bill which resulted in § 707(b)

> was to ensure middle and lower income citizens with needed consumer credit by presumably closing prior loopholes such as stacking state and federal exemptions, discharge of consumer debts by debtors with prospects of substantial future income, and other perceived abuses of the personal liquidation provisions, thereby restoring the confidence of the business community in applicants for consumer credit.
>
> . . . .
>
> [The Bill also serves] to eliminate the abuse of the bankruptcy system by debtors who are not suffering economic hardship—an abuse which has occurred with alarming frequency in recent years. At the same time, these reforms will retain that relief for those who truly deserve a new start—the people for whom the system is meant to work. . . . It has been estimated that as much as one billion dollars of debt is unnecessarily discharged annually under the present bankruptcy system. As a result, consumer credit has become expensive and difficult to obtain. . . . [M]iddle and lower income groups [ ] are paying dearly for the laxity we have introduced into our bankruptcy laws.

*See Grant* at 389, 390 (citing 130 Cong.Rec. H1810–1812 (daily ed. Mar. 21, 1984)). The court in *Grant* also noted another of the bill's sponsors who reiterated the theme that debtors, who are easily capable of paying back their debts without economic hardship, are unnecessarily discharging billions of dollars of debt on an annual basis. "I have compared this unnecessary discharge to shoplifting. The result is the same. The honest consumer is forced to pay a premium for what he or she purchases that includes the cost to the retailer of the loss incurred." *Id.* (citing 130 Cong. Rec. at H1823).

It also found that legislative history indicates that the court should consider whether the debtor is before it due to some unforeseen calamity, such as serious illness, disability or unemployment, or merely filing so that "he can get a head start on his creditors after loading up on luxury purchases and living a high lifestyle." *See Grant* at 392. In its determination that to grant the debtors' discharge would give them a head start in the race for conspicuous consumption and its concomitant status at the expense of the debtor's deserving creditors, thus, finding substantial abuse,

the court in *Grant* summarized the legislative history as follows:

> Legislative history suggests that the Chapter 7 liquidation provisions were designed to give the truly needy a fresh start, not to give those who can afford to meet their obligations a head start. At no point in their recent history have the debtors displayed a sincere resolve to tighten their belts, or to incur debts with a clear intent to pay their creditors their just due. Both schedules of current income and expenses which they have submitted to this court show excesses in the majority of their cost of living expenditures. This piling up of cash advances and consumer purchases on their credit card far in excess of their ability to repay those debts, and their failure to propose even a reasonable family budget in either of their schedules is evidence of their bad faith. The court will not permit these overextended debtors to use this court as an "escape hatch" when in the long run they can well afford to meet their obligations to a substantial degree.

*Id.*

■ This Court will now address, specifically, the facts of this case in relation to the test set forth in *Green* and the relevant materials from the cases which it suggested. This Court will present the factors in the following order:

1. Whether the debtor has the ability to repay his debts;
2. Whether the debtor filed his bankruptcy petition because of sudden illness, calamity, disability, or unemployment;
3. Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect his true financial condition;
4. Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
5. Whether the debtor's proposed family budget is excessive or unreasonable; and
6. Whether the petition was filed in good faith.

*(1) Ability to Repay Debts*

The debtor's schedules show the following categories of debts (approximate):

| | |
|---|---:|
| Credit Cards | $25,139 |
| Medical | 8,346 |
| Credit Union | 9,573 |
| Beatrice Workman(?) | 7,608 |
| Rent to Grandfather | 4,400 |
| Club | 180 |
| Total | $55,246 |

The debtor has worked at Weirton Steel for 19 years and currently nets $1,904 per month. The debtor's total current expense shown on Schedule J is $1,169. This total does not include the $300 per month which is paid to his grandfather for rent. Since the debtor has agreed to pay the medical bills for Beatrice Workman, it may be that her debt of $7,608 is included in the list of medical bills.[2] The debtor has, at a minimum from his schedules, $435 per month that could be contributed to creditors. In 3 years this would amount to $15,660 and if extended to 5 years—$26,100.

As a factor in considering whether a Chapter 7 discharge would constitute substantial abuse, the court in *Grant, supra,* looked upon the debtors with disfavor that they would have been able to pay their unsecured creditors approximately 68% of their claims with a 5–year Chapter 13 plan, whereas under Chapter 7 straight liquidation, the unsecured creditors would receive approximately 2 cents on the claimed dollar. *See Grant* at 394. In determining

---

**2.** There seems to be a discrepancy between what appears to constitute the settlement agreement between the debtor and Ms. Workman and that which is listed on the debtor's petition. Through direct testimony, the debtor answered that he had arrived at an agreement whereby he would pay for all medical bills related to the personal injury which he inflicted upon Ms. Workman. (See Transcript of Nov. 18, 1992 at 11.) He stated that he agreed to indemnify her for all such bills related to the injury. *Id.* The debtor has listed on his petition both the debts owed upon medical bills and a debt owed directly to Ms. Workman. Unless Ms. Workman has already paid some of her medical bills for which the debtor now owes her, to list the debts owed to doctors and hospitals for medical bills and a debt to Ms. Workman would be a duplication.

that the debtors could pay off 68% of their unsecured debts in a Chapter 13, the court in *Grant* made such determinations only after it noted that the debtors would need a reasonable reduction in their style and cost of living. *Id.* at 387.

Should the debtor in the matter at bar reasonably reduce his style and cost of living, he could pay off a substantial amount of his unsecured debts. Under a Chapter 7 straight liquidation, because the debtor has exempted 100% of his personal property and owns no real property, his unsecured creditors would receive nothing. Accordingly, this Court finds that his ability to repay weighs unfavorably against the debtor here.

### (2) Sudden Illness, Calamity, Disability or Unemployment

■ The debtor pleads that a major cause for his filing the petition was the unexpected calamity or disability caused by the debtor's infliction of personal injury upon Beatrice Workman. Utilizing the plain meaning of "calamity" or "disability," the debtor's causing such personal injury does not constitute an unexpected calamity or disability. According to WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (Merriam–Webster 1991), a calamity is "a state of deep distress or misery caused by major misfortune or loss ... [or] an extraordinarily grave event marked by great loss and lasting distress and affliction...." It defines disability as "the condition of being disabled ... [or an] inability to pursue an occupation because of physical or mental impairment ... [or] lack of legal qualification to do something ... [or] a disqualification, restriction, or disadvantage." *Id.* An altercation between two individuals in which one individual breaks the other's jaw, causing the aggressor to incur, by way of monetary indebtedness, responsibility for his destructive behavior, does not rise to the level constituting a calamitous or disabling circumstance.

### (3) Schedules and Statement of Current Income and Expenses

The debtor amended his schedules after the United States Trustee filed its motion to dismiss to add:

1. A personal loan to the Tin Mill Employees Credit Union in the amount of $6,769.28.
2. A settlement agreement with Beatrice Workman for $7,608.38.
3. A debt to a club—Bob Julian, dba New 48 Club—for $180.00.
4. Back due rent to Harold Smurthwaite (debtor's grandfather) for $4,400.00.

The debtor amended his current expenses as follows:

| | Original | Amended |
|---|---|---|
| Food | $250 | $300 |
| Recreation | 20 | 250 |
| Insurance | 0 | 20 |
| Insurance—Auto | 0 | 41 |

The debtor testified that he did not list his debt to the Columbia Club, as he wanted to pay them.

The omission of over 30% of the unsecured creditors, the increase of the expenditures and the intentional non-listing of a creditor that the debtor desires to pay cause the Court to question the accuracy of the schedules.

### (4) Cash Advances and Consumer Purchases Far in Excess of Ability to Repay

The court in *Peluso, supra,* in dismissing debtor's petition for substantial abuse, noted several items which weighed against granting the debtor a discharge. Some of these considerations included:

the debtor voluntarily incurring consumer debts beyond his ability to pay them;

a destructive financial pattern which did not appear to have an end in sight;

rather than limiting monthly expenditures, the debtor willingly incurring additional obligations which constricted the monies which could be paid to his creditors as a whole; and

excessive recreational expenses.

*See Peluso* at 738. Moreover, the court in *Peluso* found that where the debtor spent close to $100 per month for his cigarette addiction, in addition to his providing for

$100 a month for recreation, such expenditures were excessive.

Approximately half of the debtor's total debt is credit card debt, which is consumer debt under § 101(8). The debtor testified that approximately 55% of this debt occurred subsequent to his divorce, which was in the last 2½ years. The debtor's budget includes $250 a month in entertainment expenses. The debtor testified that the $250 was spent because the debtor frequents a lot of nights clubs and bars. The debtor's running up of so much consumer debt beyond his current ability to pay weighs unfavorably in considering his Chapter 7 discharge. Here, the debtor's provision for entertainment expenses is excessive. This voluntarily destructive financial pattern does not appear to have an end in sight. Thus, this Court finds that for the debtor to ask it to relieve him of his obligations to creditors while allowing the debtor to spend at-will whatever he wants in order to entertain himself is inappropriate.

### (5) Excessive or Unreasonable Proposed Family Budget

As hereinbefore noted, the debtor's expenditure of $250 per month on entertainment is of questionable merit. Also, this Court hesitates in considering the reasonableness of the debtor's $300 monthly food allowance. The average annual food expenditures for a single consumer in 1990 ranged between $2,300 and $2,600. U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES: 1992 (112th ed. Washington, D.C.1992, pp. 442, 443). Here, the debtor purports to spend approximately 50% more on food than does the average single consumer. The debtor's original budget included $250 a month for food and $20 a month for entertainment. Subsequent to the United States Trustee's Motion to Dismiss filed on September 10, the debtor amended his petition. Such amendment increased his food expenditures by 20% and his entertainment expenditures by over 1000%. Together with all of the hereinbefore mentioned concerns, this Court's considerations regarding the debtor's proposed budget result in a finding that such budget is excessive or unreasonable.

### (6) Good Faith

According to the debtor, Ms. Workman's claim was a major cause of his filing bankruptcy (See Response, p. 2, Item 7), yet her claim was not included in the original petition and was left off the mailing matrix entirely. No claim which is listed on the petition should be left off of the mailing matrix.

Based upon this Court's understanding of § 707(b)'s legislative history, and upon application of the totality of the circumstances test set forth in *Green, supra*, it is the opinion of this Court that the debtor's petition in bankruptcy should be dismissed for substantial abuse. However, the debtor shall be given ten (10) days from the date of this order to file a motion to convert to Chapter 13. In the event no motion is forthcoming, the petition shall be dismissed.

It is accordingly SO ORDERED.