**In re Charles H. NORRIS & Marella Mac Briggs, Debtors.**

**Bankruptcy No. 98–30727–T.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

July 13, 1998.

William G. Beninghove, Mechanicsville, VA, for Debtors.

Gregg R. Nivala, Assistant United States Trustee, Office of United States Trustee, Richmond, VA.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

Hearing was held June 2, 1998, on the motion to dismiss debtors' bankruptcy case. Such motion was filed by the United States Trustee, who contends that debtors' case runs afoul of 11 U.S.C. § 707(b) in that it represents substantial abuse of chapter 7. For the reasons set forth in this memorandum opinion the court will grant the trustee's motion.

### Findings of Fact

Debtors filed for chapter 7 bankruptcy on December 31, 1997. Prior to that time, debtors amassed a substantial amount of debt, including $170,000.00 of secured debt for their home and automobile, and $89,100.00 of unsecured nonpriority debt, the vast majority of which are credit card obligations. Ten to eleven years prior to filing for bankruptcy, debtor Charles Norris was obligated to pay child support[1] for two children from a for-

---

1. Debtors also have to pay for Norris's older     children's living expenses when they come to live

mer marriage. To meet his other expenses at the time, he began to use credit cards and cash advances therefrom. Since that time, debtors have been living month to month, and their credit card obligations have subsequently ballooned, although debtors have never missed a payment on either their credit cards or their mortgage.

Norris married co-debtor Marella Mac Briggs in 1988, and the two bought a house in 1990; debtors described getting that home as a financial "stretch." With another child by Briggs in addition to the two older children and anticipating an increase in his income in January 1996 via a boost in the percentage of commissions paid to him as a sales representative,[2] debtors bought a larger home. Debtors did, however, qualify for a mortgage based on debtors' then-current income, without accounting for any future increases. The purchase of the larger home was facilitated in part by loans taken against Briggs's 401k plan. On April 1, 1996, the company for which debtors worked was sold, and Norris was given a fixed salary of $48,000.00. This sum was much lower than the approximately $70,000.00 he would have made under his former employer based on commissions alone, and which debtors were anticipating when they purchased the larger home. In the spring of 1997 Norris's base salary was increased to $50,000.00, where it stands today. Debtors' combined gross income for 1997 was approximately $90,000.00. In order to meet the expenses of the new larger home and to pay various other expenses, debtors continued to use credit cards to stay afloat, often using cash advances from one card to pay down the balance of others and hoping that future circumstances would allow them to eventually pay down such debt. After realizing that they could not keep up with their mounting financial obligations, debtors sought consumer credit counseling in

late 1997, but counseling did not resolve their problems. Debtors finally resorted to protection under chapter 7, not wanting to file under chapter 13.

### Position of Parties

The trustee raises several concerns over debtors finances, bankruptcy schedules, and their case in general. According to debtors' schedules, the combined monthly income of debtors is $5,230.00, and their monthly expenditures total $4,772.00. Debtors' chapter 7 trustee[3] testified that the schedules did not indicate any exigent circumstances necessitating debtors' bankruptcy filing. The debtor's trustee also noted that the $150,000.00 value placed on their home was much lower than the $172,000.00 they paid for it just one year earlier. The debtor's trustee acknowledged, however, that there is a 10% expense factor to be considered in the sale of a home but nonetheless asked debtors to amend their schedules accordingly, which they have not done.[4] The debtor's trustee further stated that debtors have $32,000.00 in 401k plans between the two of them and approximately $50,000.00 of personal property, all of which is claimed as exempt. In addition, debtors intend to keep their home and automobile. Debtors' schedules also indicate that husband and wife (1) make voluntary monthly contributions to their 401k plans of $250.00 and $240.00, respectively; (2) pay $250.00 per month in taxes; (3) make $50.00 charitable contributions each month; (4) spend $150.00 per month on recreation; and (5) pay $100.00 monthly for water and sewer services. The debtor's trustee stated that (1) the contributions to the 401k plans should be distributed to creditors instead; (2) the figure for taxes was an obvious error; (3) the charitable con-

---

with debtors for three months during the summer, but debtors failed to include this amount in their schedules.

2. The increased income also would have been based on an expansion of Norris's sales territory, but such expansion never materialized. In addition, Norris attempted on several occasions to negotiate an increase in his salary, all to no avail.

3. The debtor's trustee is the individual who referred the instant case to the U.S. Trustee. The debtor's trustee was qualified as an expert to testify on matters concerning the reasonableness of bankruptcy schedules.

4. The debtor's trustee abandoned debtors' home due to their desire to keep it, and the fact that there is no equity in the home based on the value placed on the home by the debtors.

tributions should be slated for creditors;[5] (4) the recreational expenses are excessive; and (5) the water and sewer expenses were most likely for two months, not one. The debtor's trustee concluded that with debtors' excess monthly income, which should be upwards of $1,000.00 given his suggested revisions to their budget, they could consummate a 47% chapter 13 plan in three years.[6] The debtor's trustee further claimed that the 47% estimation was based on the assumption that 100% of debtors' creditors would file claims, which he asserted has never happened in his experience.

Debtors argue that the 401k contributions are the minimum amounts their employer will match[7] and that such funds are the only way the debtors can pay for their children's college expenses. They also contend that the $250.00 monthly tax expense includes $30.00 for personal property tax and that the remainder is a prorated amount of federal income tax. They admit, however, that they had a $1,000.00 tax refund in 1997.[8] They also stated that the transportation expenses listed in their schedules were actually underestimated. In addition, debtors acknowledge that Norris's ex-wife seeks $1700.00 per year for private school for their daughter, and while Norris doesn't feel that private school is necessary, he feels morally obligated to pay this sum.

### Conclusions of Law

The United States Trustee asks the court to dismiss this case for substantial abuse under Bankruptcy Code section 707(b), which provides as follows:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

As a threshold matter, debtors' obligations clearly are "primarily consumer debts," which include "debt incurred by an individual primarily for a personal, family, or household purposes." 11 U.S.C. § 101(8). Unfortunately, Congress did not provide such a useful definition for the term "substantial abuse," and the legislative history concerning this provision is of little help. What is certain is that "Congress considered and rejected the use of a threshold future income or ability to repay test (known as 'mandatory Chapter 13') as a qualification for Chapter 7 relief for consumer debtors." *Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir.1991). In addition, "the real concern behind Section 707(b) ... [is] abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." *Id.*

Despite the fact that § 707(b) does not rely on the principle of "needs-based" bankruptcy, some courts have held that the mere ability to repay debts can alone provide grounds for dismissal under § 707(b). *See, e.g., Stuart v. Koch (In re Koch)*, 109 F.3d 1285, 1288 (8th Cir.1997); *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 914 (9th Cir.1988). The Fourth Circuit, however, has held that

---

5. On June 19, 1998, the Religious Liberty and Charitable Donation Protection Act of 1998, Pub.L. No. 105–183, 112 Stat. 517 (1998) became law, thereby prohibiting courts from considering a debtor's charitable donations when determining whether dismissal is warranted under § 707(b). In light of this recent amendment to the Bankruptcy Code, the court will not take into account the debtors' charitable donations in the instant case.

6. The debtor's trustee testified that if he were debtors' counsel, he would have filed under chapter 13 in the first place.

7. Debtors' employer will match 50% of debtors' contributions, and the minimum contribution is 6% of their respective salaries.

8. In 1995 and 1996, debtors had to pay between $2,500.00 and $3,000.00 each year when filing their tax returns, and resorted to cash advances to pay those sums. To avoid having to do this again, debtors allotted $220.00 per month as "pro rated" taxes, to avoid further financial stress when their tax returns came due. On their 1997 return, however, which was filed after debtors completed their bankruptcy schedules, debtors ended up receiving a $1,000.00 refund.

while the ability to repay debts is the primary factor to consider in a § 707(b) analysis, it is one of many and cannot serve as the sole basis for dismissing a case for substantial abuse of chapter 7. *See In re Green,* 934 F.2d at 572; *Stewart v. United States Trustee (In re Stewart),* 215 B.R. 456, 467 (10th Cir. BAP 1997) (applying *Green*); *In re Smurthwaite,* 149 B.R. 409, 410 (Bankr. N.D.W.Va.1992) (applying *Green*). It is interesting to note that Congress is now contemplating legislation to establish "need-based" bankruptcy, which would foreclose chapter 7 to debtors who are able to repay a certain portion of their debts. Of course, regardless of pending legislation, the court is constrained to the holding in *Green* and its multi-factored test, and thus the court must consider more than just debtors' ability to fund a chapter 13 plan.

Under *Green,* six factors are to be considered when assessing whether a debtor is culpable of "substantial abuse" of the bankruptcy system. Those factors are, "(1) whether the debtor has the ability to repay his debts; (2) whether the debtor filed his bankruptcy petition because of sudden illness, calamity, disability, or unemployment; (3) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect his true financial condition; (4) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay; (5) whether the debtor's proposed family budget is excessive or unreasonable; and (6) whether the petition was filed in good faith." *In re Smurthwaite* at 411 (applying the factors in *Green*). The court will consider these factors in turn.

First, as amply illustrated by the facts debtors have the ability to repay a substantial portion of their debts. Even assuming that all of debtors' creditors file claims (which is highly unlikely) and by adjusting debtors' schedules to eliminate certain unnecessary or overestimated expenses, the debtors would be able to pay their creditors forty-seven cents on the dollar through a thirty-six month chapter 13 plan, or a total of $42,048.00. Conversely, if debtors remain in chapter 7, their creditors will receive next to

nothing since their real property has been abandoned by their trustee, and their personal property has all been exempted. The question remains, however, as to how much weight this first factor should be given, in light of the fact that the "ability to repay debt" is a continuum. In *In re Attanasio,* 218 B.R. 180 (Bankr.N.D.Ala.1998), the bankruptcy court collected cases dealing with how much a debtor can repay his or her debts before § 707(b) is triggered. *See id.* at 189 n. 6. From these cases, it appears that many courts have found substantial abuse to exist even when a debtor's potential to repay his or her creditors falls below the 50% mark. *See id.* In fact, some courts have found substantial abuse to exist where a debtor can pay less than 20% to his or her creditors through a three-year chapter 13 plan. *See, e.g., In re Vianese,* 192 B.R. 61 (Bankr. N.D.N.Y.1996) (substantial abuse where debtors could pay 19% to creditors by eliminating unnecessary expenses). Thus in the instant case, the "ability to repay" factor weighs against the debtors.

Second, concerning the circumstances leading up to the bankruptcy filing, the court cannot find any evidence to suggest sudden illness, calamity, disability, or unemployment. Indeed, there is nothing "sudden" about debtors' dire financial straits. Their debt has been mounting for over a decade. Nevertheless, debtors incurred certain debts by the sudden buyout of debtors' employer which resulted in the elimination of an anticipated and substantial increase in salary. At least one court has held that a "gradual erosion of finances" over a period of years militates finding in favor of a debtor. *See In re Butts,* 148 B.R. 878, 879 (Bankr.N.D.Ind. 1992). In *Butts,* however, the court further noted that "[t]his is not a situation, as so often confronts the court, in which the debtor seeks to discharge only its unsecured obligations and reaffirms all of its secured debt in order to retain the property subject to creditors' liens." *Id.* In contrast to *Butts,* debtors here seek to discharge only their unsecured obligations and have opted to retain their encumbered property. In fact, debtors considered but rejected the prospect of moving into a smaller, less costly home. Thus, while debtors' situation is quite unfor-

tunate, it cannot be said that debtors were driven into bankruptcy due to some unforeseen tragedy. Thus the second factor also weighs in favor of dismissal. *See, e.g., In re Tindall,* 184 B.R. 842, 844 (Bankr.M.D.Fla. 1994) (series of failed business ventures unfortunate, but not sudden event warranting chapter 7).

Third, there are some elements of debtors' schedules that give the court some concern. To begin, debtors have apparently undervalued their home, although the debtor's trustee has acknowledged that the valuation analysis requires a 10% reduction of value to account for costs of sale. Given this reduction, debtors' estimation is not wildly inaccurate. Next, debtors have budgeted a significant amount for sewer and water service which could probably be decreased. As for the "pro rated" monthly taxes of $220.00, the debtor's trustee testified that this sum was "clearly in error," although it appears that debtors were simply attempting to provide some advance notice that they could be liable for $2,000.00 to $3,000.00 of taxes, as prior experience dictated. The fact that they received a $1,000.00 tax refund in 1997 does not reflect negatively on the debtors' veracity, given that the refund was received after debtors' bankruptcy schedules were completed. Furthermore, the debtors actually underestimated their transportation expenses as well as their summer child care expenses. Because the inaccuracies in the debtors' schedules are relatively minor and in view of the debtors' complete candor while testifying, the court finds that any errors in debtors' schedules were not made with ill intent, and hence they do not weigh in favor of dismissal.

Fourth, as for whether debtors incurred cash advances and consumer purchases beyond their ability to pay such debts, it is obvious that debtors were living beyond their means. Debtors amassed nearly $90,000.00 of unsecured debt, most of which resulted from using one credit card to pay off another, while using still other cards to pay for living expenses. There are some additional considerations that warrant treatment here, including (1) whether debtors voluntarily incurred consumer debt beyond their ability to pay them; (2) whether debtors engaged in a de-

structive financial pattern which did not appear to have an end in sight; (3) whether debtors willingly incurred additional obligations which constricted monies that could be paid to creditors, rather than limiting monthly expenses; and (4) whether debtors incurred excessive recreational expenses. *See In re Smurthwaite,* 149 B.R. at 412. The court has already concluded that debtors took on more debt than they could pay. Next, there was in some degree of an "end being in sight" given debtors' future income prospects; unfortunately, such prospects never materialized due to the sale of debtors' employer. In addition, the court finds that debtors incurred additional obligations despite their mounting debt, thus limiting any potential payouts to creditors by continuing to use credit cards to pay for their daily expenses. Admittedly, from a review of debtors' schedules, it does not appear that they led an extravagant or excessive lifestyle, at least not in terms of acquiring large amounts of personal property. Debtors did, however, remain in a large and expensive home (which they have managed to retain), rejecting the prospect of moving to a smaller abode that would have been less costly to keep; also debtors testified that some credit card debt resulted from dining out. Significantly, debtors have utilized their 401k plans to create a reserve fund for future expenses, thus diverting funds that could otherwise be paid to creditors. *See In re Jarrell,* 189 B.R. 374, 379 (Bankr.M.D.N.C.1995) (debtor's $129.82 monthly contribution to capital investment plan unreasonable given debtor's financial circumstances). The court must conclude that debtors amassed most of their credit card debt while being unable to pay same, thus tipping the scales in favor of dismissal.

The fifth *Green* factor has been touched upon in part in the discussion above. The court finds that debtors' budget is excessive and unreasonable in terms of (1) debtors' contributions to their 401k plans (deducted from their gross income); (2) $150.00 for recreation; and (3) their overestimated $100.00 per month for sewer and water ser-

vice.[9] This factor thus weighs against the debtors.

The final consideration is whether debtors filed their petition in good faith. While the court takes issue with several aspects of debtors' bankruptcy case, it cannot be said that debtors sought bankruptcy protection out of bad faith. Debtors did not run up a large amount of debt just prior to filing, but rather their financial woes gradually mounted over the last ten years; and, as noted above, debtors did not end up in bankruptcy as a result of an extraordinarily lavish lifestyle. Debtors have not manipulated their schedules, nor have they otherwise misled the court in any fashion; they have been completely candid with the court. In addition, they sought alternatives to bankruptcy prior to filing, e.g., consumer credit counseling but found such efforts to be futile. Thus there is no bad faith on debtors' part that would compel dismissal, although the court notes that neither bad faith nor fraud are necessary elements for a finding of substantial abuse. *In re Green*, 934 F.2d at 572.

In evaluating all of the *Green* factors together, the court is left with a rather close decision. Debtors certainly have the ability to repay a substantial portion of their debts, and this is the primary factor to be considered. Their ability to repay, however, is mitigated in part by debtors' good faith and forthrightness, the relative accuracy of their bankruptcy schedules, and their lack of intent to deceive the court. On the other hand, debtors clearly took on debts while being unable to repay them, were not forced into bankruptcy due to a sudden, unexpected turn of events, and have included unreasonable expenses in their budget (including the deduction from income for deposit in their 401k plans) in order to make funds unavailable to their creditors.

Debtors have lived beyond their means and could easily fund a significant chapter 13 plan to discharge their debts and to provide their creditors with some payout. Instead, debtors propose by filing chapter 7 to maintain their more-than-adequate lifestyle at the expense of their creditors. In addition, debtors continue to try to retain money for future expenses to their creditors' detriment. *See In re Tindall*, 184 B.R. at 845 (debtors' budgeting for future replacement costs of personal property inappropriate). Debtors' actions smack of the "unfair advantage" over creditors sought to be proscribed by § 707(b). While the court is sympathetic to debtors' plight and even taking into account the presumption of granting debtors the relief they seek, the court finds that debtors' chapter 7 case should be dismissed for substantial abuse under 11 U.S.C. § 707(b).

An appropriate order will be entered.

---

**9.** The court will not take into account debtors' charitable contributions. *See supra* note 5.