**In re Sami CEMAL and Elizabeth A. Cemal, Debtors.**

**No. 03–1416–RGM.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

March 15, 2004.

Klinette H. Kindred, Law Office of Robert Weed, Alexandria, VA, Nancy Olszew-

ski Ryan, Law Office of Nancy O. Ryan, Falls Church, VA, for Debtors.

## MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

THIS CASE is before the court on the United States Trustee's motion to dismiss this chapter 7 case for substantial abuse under § 707(b) of the Bankruptcy Code. This memorandum opinion supplements the oral ruling of February 25, 2004.

### Background

Sami and Elizabeth Cemal filed a joint petition in bankruptcy pursuant to chapter 7 of the United States Bankruptcy Code in this court on October 10, 2003. They scheduled 20 unsecured creditors with outstanding claims of $185,717.70. All but one are credit card debts.[1] They own a single family detached home which has a value of about $208,000 [2] and which is security for a note with an outstanding balance of about $218,951. They scheduled personal property with a value of $28,532.88, all of which is exempt.[3]

Schedule I, "Current Income of Individual Debtors," reflects that both are employed. Mrs. Cemal is employed as a foreign service officer at the Department of State and had been employed there 33 years when she filed the petition in bankruptcy. Her gross income was $7,713.33 per month with a net monthly income of $4,455.40. Mr. Cemal is an auto mechanic and had been employed by his present employer for four years. His gross income was $3,996.63 a month; his net income, $3,048.08. Their total combined monthly net income was $7,504.20. Their total monthly expenses were $6,435.21. Schedule J, "Current Expenses of Individual Debtors." [4]

Both Mr. and Mrs. Cemal are in their mid–50's. Mrs. Cemal plans to retire on June 3, 2005 at age 56. She is in good health. Mr. Cemal has no present plan to retire. He had open heart surgery in November, 2000. He was out of work for seven weeks and returned part-time for several months after that, gradually returning to full-time employment. He later suffered a herniated disk which caused him to lose more time from work. He is currently working full-time. He monitors his health but is not limited in his activities.

Mr. and Mrs. Cemal were married in 1983. They moved frequently as a result of Mrs. Cemal's employment with the State Department. From 1983 to 1999, Mrs. Cemal was stationed in Karachi, Pakistan; Islamabad, Pakistan; New Delhi, India; Dhaka, Bangladesh; and Rabat, Morocco. In 1999, Mrs. Cemal was assigned to the State Department in Washington, D.C. Every time Mrs. Cemal received a new foreign assignment, Mr. Cemal was unemployed from four to eight months while he looked for a new job. In each instance, the local embassy ultimately found a job for him.

---

1. The sole exception is a signature loan from the State Department Federal Credit Union.

2. Schedule A, "Real Property," states that the value is based on an April 2003 appraisal.

3. The most valuable asset is Mrs. Cemal's Thrift Savings Plan which they scheduled with a value of $11,000. The second most valuable asset was their 1999 Plymouth Breeze automobile which they scheduled with a value of $5,100 and is subject to a $4,225 lien. They scheduled $2,760 in accrued but unpaid wages and $2,652 in cash on hand or in the bank. The remaining $6,921 in assets were typical household furnishings and a second car, a 1992 Chevrolet Corsica.

4. The Cemals filed updated Schedules I and J on February 3, 2004. There was little change in net disposable income.

They bought their home on June 28, 1999. They paid $133,000.00 for it and financed it with a loan in the original principal amount of $132,282.00. Their down payment and closing costs totaled $3,437.11. On December 13, 1999, they placed a second trust on the property for $36,300.00. The second trust paid $30,264 at closing to two credit card bills and two State Department Federal Credit Union loans. On August 26, 2002, the Cemals refinanced their home. The new loan amount was $171,900.00. The principal purpose was to consolidate the first and second trusts. Two credit cards were paid relatively modest amounts from the refinance. On April 23, 2003, they refinanced the house again. The new loan was $218,951.28. Two credit card creditors were paid almost $26,000.00 out of that settlement.

The Cemals' credit card debt is of long-standing. Mrs. Cemal came into the marriage with about $50,000.00 in credit card debt from her prior marriage.[5] During the course of her assignments abroad, the credit card debt increased. Each time Mrs. Cemal was reassigned, Mr. Cemal was unemployed and additional credit card debt was incurred to meet relocation and daily expenses. By June, 1999, when they returned to the United States, their outstanding balance to credit cards was about $82,000.00. By the end of 2000, it was about $121,000.00; by October 2001, $164,143; and by October 2003, $176,241.[6] (Ex. L).

Some time in 2001, Mr. and Mrs. Cemal realized that it was becoming more difficult to make payments on their credit card obligations. Mrs. Cemal testified that she felt that things were "getting out of control." Before then they had always been able to meet their obligations. However, as the credit card obligations increased, the result in large part due to Mr. Cemal's surgery and recuperation which disrupted the family income, the minimum payments increased and the family budget was pressed even more. The refinances were efforts to get things under control by paying off credit card debt, reducing interest rates and lowering their monthly payments.[7]

Starting in 2001, the Cemals sought credit counseling. They first sought counseling with Ameridebt where they submitted five or six of their credit cards to a repayment plan. They paid Ameridebt $1,750 a month to service the credit cards. This plan worked for six months until Mr. Cemal suffered a herniated disk. He missed work as a result of the injury and in order to receive physical therapy to assist in his recovery. Mr. Cemal did not have sick leave and, therefore, all lost work was uncompensated. This interruption of their income made continuation of

---

5. Mrs. Cemal's testimony was not clear as to whether this was the amount of debt incurred during her first marriage or during the five years that she was a single mother or both. She received no child support payments from her first husband.

6. It is not clear how much of the total debt represents new purchases as opposed to accrued finance charges. In the two years from October 2001 to October 2003, there were new purchases of $18,104 and payments of $54,432, not including debt payments from the refinances. (Ex. L).

7. The court cannot tell whether the April 23, 2003, refinance was of any real benefit to the Cemals. The loan was made by Beneficial Mortgage Co. of Virginia. Two creditors were paid: Beneficial in the amount of $11,113.10 and Discover in the amount of $14,700.00. The lender, in addition to paying off a loan to itself or an affiliate, charged 5 points or $10,947.56 in connection with the loan. The refinance did give the Cemals temporary relief because they received $8,553.70, which Mrs. Cemal testified went to pay ordinary expenses.

the Ameridebt debt counseling service impossible without a temporary reduction in the monthly payment. When the request was rejected, they were forced to withdraw from the program. They next turned to Debt Rescue, LLC, to whom they paid $8,945.00 in fees. Through no fault of their own, this service did not benefit them at all. Finally, they tried a third service, Brite Start, for three months which was also unsuccessful.

### United States Trustee's Position

The United States Trustee's case at the hearing closely followed his motion to dismiss. His principal argument was that "notwithstanding various mitigating circumstances, the debtors' clear ability to repay at least 20% of unsecured debt over 36 months, coupled with a budget containing numerous extravagances" required dismissal for substantial abuse. Motion to Dismiss, ¶ 10. (Docket Entry 9). In short, the Cemals had sufficient income to fund a chapter 13 plan.

The United States Trustee addressed each of the six factors specifically set out in *Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir.1991). First, he argued that the debtors had the ability to repay their debts. The original Schedules I and J reflected net disposable income of $1,068.99 a month, however, a "more reasonable budget" would result in an even larger payment to unsecured creditors. Motion at 6. At trial he argued that the debtors, with some "belt tightening", could repay $60,000.00 over 36 months, a 30% distribution to unsecured creditors.[8]

The United States Trustee argued that the Cemals' proposed budget was excessive and unreasonable. He pointed to voluntary repayments of Thrift Savings Program ("TSP") loans and continued voluntary TSP contributions, all totaling more than $800 a month. Motion at 7. In addition, he pointed to six monthly expenses that he argued were too high. Motion at 8. He concluded that in light of the TSP loan repayments, voluntary TSP contributions and the six expense items that he argued should be reduced, the debtors' schedules and statement of current income and expenses did not accurately reflect the debtors' true financial condition. Motion at 9.

There was no sudden illness, calamity, disability or unemployment, but rather the cause of their financial distress was "a refusal to make a genuine attempt at belt tightening before resorting to" bankruptcy. Motion at 7. Mr. Cemal's open heart surgery in January 2000[9] was dismissed as a proximate cause of their October 10, 2003, filing. Motion at 6. He acknowledged that the case was not commenced in bad faith. Motion at 9.

The United States Trustee concludes:

The court has before it a married couple with no dependents who, according to the schedules that they have filed, earn over $140,000 per year and are capable of repaying their unsecured creditors at least 20% (over $3 8,000) of their claims during the course of a 36 month chapter 13 plan. In addition, these debtors have elected to maintain their food expenditures at a level far above commonly accepted averages, have continued to budget money for gambling losses at the rate of $7,200 per year, and have maintained contributions for savings and repayment of themselves to their retirement plan at the rate of $10,379.98 per year. A downward adjustment of these

---

**8.** In the motion, he argued that the amount was $38,000 over 36 months for a 20% distribution. Motion at 10.

**9.** Mr. Cemal testified that the surgery was in November 2000.

monthly expenditures would allow for an even greater payment to their unsecured creditors. To allow the debtors to refuse to regulate such conduct is unfair to their creditors and an abuse of the bankruptcy system.

Motion at 10.

### Debtors' Position

Mr. and Mrs. Cemal contest the United States Trustee's *Green* analysis and reach the opposite conclusion. They candidly admit, as they must, that they do have net disposable income, however, they vigorously contest the conclusion that it is evidence that they are abusing the bankruptcy system. They provided a 21–year financial and personal history to explain how they got into their present dire situation and testified how they sought to remedy the problem through refinancing their home and participating in debt counseling programs.

### Discussion

### Legal Standard: *Green v. Staples (In re Green)*

Section 707(b) provides as follows:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

■■■ Congress did not define the term "substantial abuse" and left the articula-

tion of the parameters to the courts. The Court of Appeals for the Fourth Circuit adopted a totality of the circumstances test. Although the ability to repay is a primary factor to be considered in a § 707(b) analysis, it is one of many factors and cannot serve as a sole basis for dismissing a case for substantial abuse. *See In re Green*, 934 F.2d at 572. The Court of Appeals rejected looking solely to the ability of the debtor to repay his debts. "Congress considered and rejected the use of a threshold future income or ability to repay test (known as 'mandatory chapter 13') as a qualification for chapter 7 relief for consumer debtors." *In re Green*, 934 F.2d at 571. The totality of the circumstances test seeks to separate honest debtors who are entitled to a fresh start from those who would abuse of the bankruptcy process by seeking to take unfair advantage of their creditors. *Id.* at 572.

■■■ *Green* identifies six factors to be considered in determining whether a petition should be dismissed for substantial abuse. The enumerated factors [10] are (1) whether the debtor has the ability to repay his debts; (2) whether the debtor filed his bankruptcy petition because of sudden illness, calamity, disability, or unemployment; (3) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect his true financial condition; (4) whether the debtor incurred cash advances and made consumer purchases far and excess of his ability to repay; (5) whether the debtor's proposed family budget is excessive or unreasonable; and (6) whether the petition was filed in good faith. *Green*, 934 F.2d at 572. For cases applying *Green*, see *Stewart v. United States Trus-*

---

10. The *Green* list is illustrative rather than exhaustive. *In re Green*, 934 F.2d at 572 ("The 'totality of the circumstances' approach

involves an evaluation of factors *such as the following*") (emphasis added).

*tee (In re Stewart)* 215 B.R. 456, 467 (10th Cir. BAP 1997); *In re Norris,* 225 B.R. 329, 331–332 (Bankr.E.D.Va.1998)(Tice, J.); *In re Smurthwaite,* 149 B.R. 409, 410 (Bankr.N.D.W.Va.1992).

■ The United States Trustee emphasized the debtors' ability to fund a chapter 13 plan. While this element is generally present in a finding of substantial abuse, it is not itself a sufficient element. A finding of substantial abuse may not be bottomed solely on the ability of a debtor to qualify for chapter 13 relief, obtain confirmation of a chapter 13 plan and successfully complete a chapter 13 plan. *Green,* 934 F.2d at 572–73. Successful completion of a particular chapter 13 plan is difficult to predict. While feasibility is a confirmation requirement, 75% of the chapter 13 petitions in this division fail to result in a chapter 13 discharge.[11] Section 707(b) makes no reference to chapter 13 and does not permit the court to convert the case to chapter 13.[12] Chapter 13 relief remains voluntary. 11 U.S.C. § 1307(b). *Green* teaches that the mere presence of net disposable income that could support a chapter 13 plan is not in and of itself sufficient to find substantial abuse. It is but one factor to be considered.

Some of the factors listed in *Green* are closely related. In this case, the examination of the proposed family budget is a prerequisite to determining the extent to which the debtors have the current ability to pay their creditors. The court must then determine whether this ability will continue into the future. The court will first consider these factors and then consider the other *Green* factors.

### Ability to Repay Debts

■ **Is the debtors' proposed family budget excessive or unreasonable?** The United States Trustee attacks the debtors' budget on two principal grounds, first that Mrs. Cemal is repaying TSP loans and making voluntary contributions to her TSP plan; and second, that certain expenditures are overstated or extravagant.[13] The United States Trustee argues that there is in fact more net disposable income.

The United States Trustee points out that Schedule I shows that $486.26 is withheld from Mrs. Cemal's pay each month for contributions to the TSP and the repayment of a TSP loan.[14] He argues that the voluntary contribution to TSP is discretionary and the repayment of the TSP loan is, in reality, merely repayment of a loan to the debtor herself. Neither should be allowed during the pendency of a chapter 13 plan. These adjustments would increase the Cemals' net disposable income by $486.26 a month, for a total over 36 months of more than $17,500. *In re Wat-*

---

11. The court is not aware of any detailed analysis that differentiates chapter 13 cases that are dismissed or converted before confirmation because no plan is feasible and those that are dismissed or converted after a confirmed plan has been partially completed. It is fair to say, however, that most confirmed chapter 13 plans are unsuccessful.

12. If a debtor is denied chapter 7 relief for substantial abuse, the sole remedy is dismissal. It is true that in many cases the debtor will voluntarily convert to chapter 13, but that is not required.

13. Whether expenses are overstated or extravagant address two different factors. One—overstatement of expenses—goes to the accuracy of the schedules. The other—extravagance—goes to the reasonableness of the budget. Both are discussed here so that a fair net disposable income can be determined. The accuracy factor is discussed further later in this opinion.

14. The voluntary contribution to the TSP was $337.03 and the repayment of TSP loans was $149.23.

*kins,* 216 B.R. 394 (Bankr.W.D.Tex.1997); *In re Scott,* 142 B.R. 126 (Bankr.E.D.Va.1992)(Shelley, J.). The schedules accurately reflect the TSP loan payments and contributions. The question is whether they are excessive or unreasonable.

There are two TSP loans. The first one, with a balance of about $9,000, was incurred in 2001 to assist the family as a result of Mr. Cemal's open heart surgery. The second, with a balance of about $2,300, was used to pay some of the credit cards. Together they total about $11,300.00. There are tax consequences if the loans are not repaid. The amount of the loans is treated as income for tax purposes and, therefore, income taxes become due. In addition, there is a 10 percent early withdrawal penalty. Typically, in a chapter 13 case, the additional tax is paid through the chapter 13 plan as a § 1305 claim. *See* 11 U.S.C. § 1305. While this increases the net disposable income available to fund a chapter 13 plan, it also increases the claims to be paid. Since the tax claim is paid in full, the net benefit to the unsecured creditors is less than the loan repayments. The benefit to the creditors can be estimated. Here the net benefit would be about $13,000.

■ The United States Trustee's argument is not particularly persuasive in this case. While the United States Trustee is correct about the rule, the rule is one that is applicable in chapter 13 cases. There the court is seeking to determine whether a proposed chapter 13 plan satisfies the net disposable income test of § 1325(b)(1)(B). This case, however, concerns substantial abuse in a chapter 7 case and the argument is less persuasive. The purposes of § 707(b) and § 1325(b)(1)(b) are different. Section 1325 is designed to assure that a chapter 13 debtor makes his best efforts in a chapter 13 plan. Section

707(b) is a gatekeeping provision designed to assure that chapter 7 is not abused. The abuse sought to be prevented is "a debtor seeking to take unfair advantage of his creditors." *Green,* 934 F.2d at 572. There are different considerations. Here, some of the TSP loan was used to pay creditors. The TSP assets are exempt. In considering substantial abuse, it is somewhat perverse to say that a debtor who borrowed from her exempt TSP plan to pay creditors is abusing chapter 7 bankruptcy relief by budgeting the repayment of the very TSP loan. Had she never borrowed from the TSP the creditors would never have been paid from that portion of the TSP loan and she would have had a more valuable exempt asset.

Another consideration is the Cemals' age and their other retirement assets. The Cemals are approaching retirement. While Mrs. Cemal is the beneficiary of a government retirement program, Mr. Cemal has no retirement plan. Mrs. Cemal's pension will be 70 percent of her highest three years salary. She may also elect survivor benefits which will reduce her retirement benefits but provide some benefits for her husband is he survives her. The only other retirement assets from which Mr. Cemal would benefit if his wife were to predecease him is the TSP account. She will elect some survivor benefits so that his health coverage will be continued, but they have not made a final determination of the extent of the election. The consideration of the legitimate retirement concerns of the debtors is appropriate in considering substantial abuse. Such a consideration does not take unfair advantage of the Cemals' creditors. If the TSP loan is not repaid, Mrs. Cemal will not have an opportunity to reestablish the TSP in the future. If she were 30 years younger, the United States Trustee's argument would have more force. Here, however, if

the Cemals converted to chapter 13, the plan would continue for at least three years. Mrs. Cemal could reasonably be expected to retire at that time [15] without ever having had the opportunity to reestablish the depleted TSP account. Similarly, she would be deprived of the matching funds available for her new voluntary contributions to her TSP account.

■ The cases cited by the United States Trustee are both chapter 13 cases. The standard enunciated in them serves a different purpose in chapter 13 and does not necessarily apply to § 707(b) motions. If one were looking only for income available to fund a chapter 13 plan to determine substantial abuse, the chapter 13 standard would have greater relevance, but "a debtor's possession of income in excess of his necessary expenses, standing alone" does not constitute substantial abuse. *Green*, 934 F.2d at 571. The goal here is to find substantial abuse.

In this case, the considerations on both sides tend to balance each other. The strict chapter 13 rule is mitigated by the Cemals' age, the fact that a portion of the TSP loan (although not a large portion) was used to pay creditors, the tax consequences attendant to the transaction and the fact that participation in the TSP program is a well-accepted and long established financial activity. While application of the chapter 13 rule would increase the Cemals' net disposable income and weighs against the Cemals, allowing the repayment in chapter 7 is not taking an *unfair* advantage of their creditors. The effect of the United States Trustee's argument is substantially muted when compared to the same argument presented at a chapter 13 confirmation hearing.

The United States Trustee next argues that the some of the debtors' expenditures are excessive. This argument encompasses both issues of accuracy (overstatement) and extravagance. He focuses on the monthly food budget. The debtors originally scheduled $1,600.00 for monthly food expenses for a family of two but amended it to $1,290. The United States Trustee notes that the Internal Revenue Service collection financial standards indicate that the appropriate food budget for a family of two with the debtors' income is $676.00 per month. The debtor, however, points out that the IRS also allows for housekeeping supplies, apparel and services, personal care products and services, and miscellaneous expenses totaling $1,290.00. These items are purchased at the grocery store and are included in the food line item. In fact, the IRS collection financial standards provide a total of $830 which is included in the food line item in Schedule J. The debtors erroneously include apparel and services (laundry) and miscellaneous expenses, all of which are separate line items on Schedule J. While the line items on Schedule J do not correspond exactly with the IRS collection financial standards categories, the comparable entries for these expenses on Schedule J are in line with the IRS collection financial standards.

The debtors based their food budget on their actual grocery store receipts which were introduced into evidence. For the first 11 months of 2003, they reflect a monthly average of $991.71. No particular item on the receipts stands out. The receipts look remarkably typical. In addition, to the receipts, they estimated expenses for lunches, snacks and a few restaurant meals, which would account for the difference between $1,290.00 and the grocery receipts of $991.71. Mrs. Cemal testified that she buys all of her housekeeping supplies and other household supplies at the grocery store and that her

---

**15.** See discussion of Mrs. Cemal's intended retirement below.

food expenses are higher than they might otherwise be because of her long commute. She gets up about 4:00 a.m. so that she can catch a commuter bus to downtown Washington and be at her desk by 7:30 a.m. She gets home between 5:00 p.m. and 6:00 p.m. She buys foods that are pre-prepared so as to reduce the time that she has to cook when she gets home. She also included a few restaurant meals a month and typical lunches. The evidence was credible although the testimony with respect to the lunches, snacks and restaurant meals was weaker than the grocery purchases. The United States Trustee introduced no evidence, other than the IRS collection financial standards, to rebut Mrs. Cemal's testimony. The amounts scheduled are substantially accurate and fairly reflect the debtors' actual expenses. They are not extravagant. The receipts do not reflect luxury items or gourmet foods. The food budget, which includes housekeeping supplies and personal care products, is clearly higher than a poverty budget but is not luxurious. It is subject to some belt-tightening, however, the effects of belt-tightening are not as much as the United States Trustee urges.

The United States Trustee also questioned several other expenses such as the home maintenance expenses, the transportation expenses, and a $20.00 a month lawn service expense.

The debtors testified that their house is 25 years old and has not been remodeled. It is in average condition. The basement flooded and Mr. Cemal is making repairs as they can afford them. The gutters need to be replaced and the house needs to be painted. The lawn service expense of $20.00 a month which is separately listed is more properly included in the $300 line item for monthly home maintenance, without raising that line item. While the United States Trustee argued that the Cemals should cancel the lawn service—a part of his general belt-tightening argument—the lawn service is not an unreasonable expense. The service is for fertilizer and weed control and is prorated over the entire year. Even if the service were cancelled, one would expect a homeowner to incur an expense for fertilizer and weed control chemicals. Such expenses are normal, typical expenses in the community. In light of the damage to the basement and the need for gutters and painting, the expense scheduled is within the bounds of reasonableness for the near future. Once the work is complete, the expense should be reduced. While there was no testimony of the expected total cost for the three jobs, assuming that Mr. Cemal continues to perform the labor for the basement work, the cost can reasonably be estimated to be in the $3,000 to $5,000 range.

The United States Trustee argued that the transportation expenses of $520 a month were too high. While the transportation expenses appear high and require explanation, Mr. and Mrs. Cemal provided a satisfactory explanation. They testified that Mr. Cemal's commute is 33 miles one way. He uses two tanks of gas a week at about $22.00 to $24.00 a tank. Mrs. Cemal rises early so that she can drive to a commuter bus stop, catch a commuter bus from Woodbridge, Virginia to Washington, D.C., and arrive at work by 7:30 a.m. Between the two commutes and ordinary travel, Mrs. Cemal estimated that they spend $520.00 a month on transportation. The expense is both accurate and reasonable.

Overall the debtors satisfactorily explained and defended their expenditures. It is possible to recommend certain changes that would lower some of the debtors' monthly expenses, but the overall savings would not alter the court's ultimate decision.

The United States Trustee argued that the debtors should give up their gambling. They can be described as recreational gamblers. The United States Trustee, who had copies of the debtors' credit card statements for the 18 months prior to the filing of the petition, noted six trips to Atlantic City. He also noted that the debtors stated in their statement of financial affairs that during the year preceding the filing of the petition that they had lost $7,200.00 gambling.[16] Mrs. Cemal testified that they buy several lottery tickets a week, play bingo at the firehouse on Sunday and take three or four trips to casinos in Atlantic City every year. It is for them, she testified, their recreation. The short answer to the United States Trustee's concern is that gambling is not in the budget. What the debtors may have done in the past and is not included in their current budget has no relevance to the analysis of the accuracy of their current budget and does not affect the net disposable income already shown on their budget. There is no line item for gambling.

That being said, Mrs. Cemal's characterization of their gambling activities as recreation directs the court's attention to the line item for recreation, which is $212.60. This entry is for "Recreation, clubs and entertainment, newspapers, magazines, etc." This obviously does not continue the prior expenses for the debtors' recreational gambling. Although it is on the high side for a monthly expense, an annual recreational budget typically is not expended in equal installments over the year. A trip to the beach or other short vacation could easily account for a large portion of an annual recreation budget. It should be

noted that Mr. Cemal testified that he is a naturalized American originally from Cyprus where his family remains. He has not visited Cyprus or seen his family in over nine years because he has not had the money to do so. The recreation budget is not unreasonable. The particular items upon which it is expended is up to the debtors, be it bingo, bowling, movies or a short trip to Atlantic City.

Overall, the budget as reflected in the debtors' original and amended Schedules I and J is a fair budget that accurately reflects the debtors' expenses. While the United States Trustee is correct that with some belt-tightening some of the expenses could be reduced, realistic changes do not materially affect the court's analysis. There is, as the debtors candidly admit, net disposable income. They state that it is about $1,100 a month. With belt-tightening it could be as much as $1,650 a month.[17]

***Do the debtors have the current ability to repay their debts?*** The debtors do not have the ability to continue to meet their contractual obligations. Their credit card debt, as of the date of filing, was about $171,500.00. They also had a signature loan with a credit union with a balance of $14,236.00. Ignoring the signature loan, the debtors would need about $3,430 a month to make the minimum payments on all the credit card accounts, assuming that the minimum payment is 2% of the outstanding balance. This does not include any over limit charges and any increase arising solely from finance charges from the date of the petition to today. It

---

**16.** It is unclear whether this was the gross loss or the net loss.

**17.** It is not clear what the impact of completing the home repairs and paying off the car loan will be. Both should be completed within 12 to 24 months and would free up addi-

tional income. However, the older car may need to be replaced. These questions were not addressed by the parties. Possibly they felt that these potential future changes cancelled each other out.

is apparent that the debtors simply do not have the ability to make these contractual payments. Outside bankruptcy it is clear that the Cemals do not have the ability to repay these debts.

In a 36–month chapter 13 case after payment of the chapter 13 trustee's fees and expenses, the distribution to unsecured creditors would be 19.2% at $1,100 per month, 24.4% at $1,400 per month and 28.8% at $1,650 per month. The lowest amount reflects the net disposable income reflected on the debtors' Schedules I and J. The highest amount reflects the United States Trustee's best position—both belt-tightening and elimination of the TSP contributions and TSP loan payments. The debtors have the present ability to make a payment to unsecured creditors.

***Will the debtors' ability to repay their debts continue into the future?*** Even if the debtors have the current ability to make a payment to their unsecured creditors, the court must determine whether that ability is likely to continue for at least the next three years.

Mrs. Cemal is employed by the State Department as a foreign service officer. She has been assigned to Washington, D.C. since 1999 and testified that as a foreign service officer she is limited to working in Washington for six consecutive years. At the end of the six-year period, she must accept an assignment abroad. She has already obtained a one-year extension which will expire in June 2005. At that time, her six-year period will expire and she will be stationed abroad.[18] The most likely postings would be in South Asia where she has previously been assigned. She was previously assigned to Dhaka, Bangladesh; Karachi and Islamabad, Pakistan; New Delhi, India; and Rabat, Morocco. In addition to her prior posts, there are also assignments becoming available in Iraq and Afghanistan. The latter two are considered hardship posts and would be for a one-year period. The others would likely be a three-year assignment.[19]

Mrs. Cemal testified that upon each prior assignment, her husband had been unemployed for a period of four to eight months. When she is reassigned to a foreign post, the State Department assists in finding employment for her spouse, often for the embassy itself. However, this takes time. Historically, they have lost four to eight months of his income.

The Cemals' relocation abroad would practically preclude any payment to unsecured creditors for a significant period of time.[20] There are three principal problems that they would encounter. There would be extraordinary expenses associated with the move. Mr. Cemal's income would be temporarily lost. They own a house. The loss of Mr. Cemal's income is significant. It eliminates any disposable

---

**18.** There are limited situations in which the six-year period may be extended.

**19.** While there are other assignments, such as in Europe, it is not clear that they would be available to Mrs. Cemal for various reasons including her lack of foreign language ability. There is also a question as to the assignment because of her husband's health. The question is whether he would receive a medical clearance, and if so, the level of medical clearance. This question arises because of his previous open heart surgery.

**20.** While it may be possible to craft a chapter 13 plan such that no payments would be made during this period, such a hiatus would substantially reduce the value of a proposed distribution to creditors. More importantly, though, there is presently no reliable way to determine the duration of such a period or the ultimate consequences on their future income.

income during that period of time. It would take some time to restore income stability, at least four to eight months for Mr. Cemal to find a new job and start receiving a paycheck. Without knowing where the new assignment might be, it is difficult to estimate today Mr. Cemal's new salary.

The house poses a more difficult situation. They are not in a position to sell the house. The loans encumbering the property are about equal to its fair market value. There is no equity that would yield funds at closing to pay a real estate agent a commission. They would have no ability to come up with funds at closing if they were in a chapter 13 plan. There would be costs to get the property ready to market which would also reduce the amount available to creditors. They could rent the property. However, landlords must anticipate vacancies between tenancies and reserve funds to prepare the house for a new tenant. The Cemals would not have the ability to both fund a chapter 13 plan and rent the house. It is more than likely that sometime during the course of the chapter 13 plan, the house would be vacant or additional funds would be needed to maintain the house. Nor is it clear that the rent and tax benefits would cover the mortgage payments and fixed costs of ownership. Another option is to let the house go to foreclosure. This, however, would very likely result in a deficiency that would dilute the unsecured creditors' distribution. If Mrs. Cemal were to remain a foreign service officer and accept an assignment abroad, the court concludes that their current ability to pay their creditors would not continue. It would undoubtedly be destroyed.

There are alternatives to accepting an assignment abroad. Mrs. Cemal testified that one possibility is to transfer out of the foreign service into another civilian occupation within the State Department. She was not sure that such an opening would be available, and if so, the terms upon which it would be made.

Another alternative is for Mrs. Cemal to retire and seek employment outside the government.[21] In order to make this alternative work, she would need a job that pays about $33,000.00 to $35,000.00 annually in order to maintain her current income level. The balance of her income would be her retirement pay. Her testimony indicates that she has thought about driving a school bus or working at a daycare facility. These two occupations are not noted for entry level positions in the range of compensation that would be necessary for Mrs. Cemal to retain her current income level. More appropriate employment would lie with a job in the civilian work force that would capitalize on the skills she developed as a foreign service officer. Mrs. Cemal seemed to think that such a job was not particularly likely, although she could not exclude it. The United States Trustee presented no evidence that such a position would be available and if so, the terms of employment.[22]

---

**21.** In fact, Mrs. Cemal has decided to retire from government service in June, 2005. She expressed two principal reasons. She does not want to be stationed abroad and her retirement benefits will reach their maximum level at that time. Mrs. Cemal is now 55 years old and in June, 2005, will have worked for the United States government for 35 years. Her retirement benefits will reach their maximum percentage level, 70%, at that point.

The benefit will be reduced to the extent that she elects survivor benefits for her husband.

**22.** The court notes that employment stability is an important factor in successful completion of a chapter 13 plan. Loss of overtime, change in hours and job changes often accompany chapter 13 defaults. A change in jobs, even when promptly and successfully

In consideration of Mrs. Cemal's current employment, the court believes that her future employment and ability to continue the current salary for at least three years is clouded. It is reasonable to conclude that she will not remain a foreign service officer after June, 2005, because of the hardship that such an assignment would impose on her and her husband. Such an assignment lacks of any meaningful economic benefit to the creditors, and her decision to retire is neither unreasonable nor abusive to her creditors. The alternatives are not clear and it cannot be said with any degree of reasonable certainty that her income level will be maintained at the current level.

The court finds that while the Cemals have the present ability to fund a chapter 13 plan that could pay the scheduled unsecured creditors a distribution from 19.2% to 28.8%, net of the chapter 13 trustee's fees and expenses, it is not likely that their current income will continue unabated during the next three years. The likely interruption in their income would significantly challenge their ability to complete any chapter 13 plan and probably prevent its successful completion.

### Precipitating Events

*Was the bankruptcy petition filed because of sudden illness, calamity, disability, or unemployment?* *Green* suggests that one factor a court should consider is whether a petition was filed because of a debtor's sudden illness, calamity, disability or unemployment. The United States Trustee argues that Mr.

Cemal's open heart surgery is too remote because it occurred in 2000, about three years before the Cemals filed their petition.

The court agrees with the United States Trustee that there must be a relationship between the illness, disability or unemployment and the filing of the petition. The illness, disability or unemployment must be proximately related the cause of the financial distress.[23] The United States Trustee's focus is, however, too narrow. In the context of the debtors' long-term financial affairs, it is apparent that Mr. Cemal's heart problem was the proverbial straw that broke the camel's back. The Cemals just did not know it for some time.

Mr. and Mrs. Cemal are a typical two-income family. Both work. Their standard of living is based on both incomes. Mrs. Cemal's income has remained stable for many years. Thirty-four years ago, she began working for the government as a clerk-typist and worked up to her current position as a management officer. Unfortunately, Mr. Cemal's income has been more volatile. He has been periodically unemployed as his wife received different assignments. In November, 2000, he encountered health problems that further disrupted his income. Up to that time they were making ends meet and were paying their bills as they matured. His unemployment arising from his cardiac problems left a big hole in the family budget. They appear to have done what they did in the past. They made ends

achieved often results in some missed paychecks.

**23.** All of the events enumerated by the Court of Appeals share a common factor: income disruption. *Green* suggests that if income disruption is the cause of the debtor's financial distress the causes of the disruption should be considered. If they are beyond the control of the debtor, they weigh against finding substantial abuse. If they are caused by the debtor's voluntary conduct, they weigh in favor of substantial abuse. Separation or divorce may weigh against finding substantial abuse. Voluntary unemployment or underemployment would weigh in favor of finding substantial abuse.

meet as best they could. The credit card balances increased. They took a TSP loan. They expected to be able to make all their payments as they became due and get past this difficult time. In fact, they did get past these health difficulties. However, what they did not realize was that before Mr. Cemal's health problems, they were close to their financial limit. The additional debt created higher monthly payments, payments that became increasingly difficult to meet. Mrs. Cemal testified that in 2001 she found it harder and harder to make the monthly payments and that things were "getting out of control." She did not testify to exactly what happened to bring her to this realization, however, in the typical scenario, the credit card company's devices that encourage timely payment—late charges, over limit fees, default interest rates—begin to work against both the cardholder and the credit card company. The additional charges are added to the monthly minimum payment. The cardholder who is having difficulty paying the old minimum payment is faced with an even higher minimum payment. The death spiral begins. Credit limits are exhausted. Finance charges accrue. The cardholder begins to despair.

Mrs. Cemal recognized their inability to continue to make all payments on time and turned to credit counseling companies. The first, Ameridebt, required a monthly payment of $1,750 to deal with only five or six of the 18 credit cards. These cards were paid more than the minimum payments. The program appears to have been successful until Mr. Cemal suffered a second health problem, a herniated disc. This again disrupted the family income and they were unable to continue in the Ameridebt program. They refinanced their home on August 26, 2002, and again on April 23, 2003. They paid creditors $27,297 from the refinances and obtained $14,300 in cash. The cash went principally to catch up on the credit card bills.

In August, 2002, Mrs. Cemal enrolled in a second debt counseling service, Debt Rescue. She testified that their fee for a one-year period was $9,945. She paid most of that fee, but did not complete the year. The idea appears to have been that the Cemals were to stop paying the affected credit cards and set aside $1,000 a month. Debt Rescue would then seek to negotiate a compromise pay-off with the credit card companies which would be funded from the $1,000 a month the debtors set aside. She testified that Debt Rescue was unable to achieve any negotiated settlement. In the interim, finance charges accrued and the balances grew. Debt Rescue, she felt, made matters worse.

The sudden calamity need not immediately precede the filing of a petition in bankruptcy. It should, however, be closely related to the circumstances giving rise to the filing of the petition. Here, the Cemals' finances were stretched to the limit in November, 2000, when Mr. Cemal fell ill. They sought to honor their commitments and get through the difficult times, but their very efforts were counterproductive. The new debt exceeded their ability to service it and it became harder and harder to make ends meet. The intervention of Ameridebt may have stabilized the matter briefly, but Mr. Cemal's second health problem ended whatever hope they may have had. From then on, with the benefit of hindsight, it was not a question of whether they would file bankruptcy, only when. Nonetheless, they tried to pay their creditors. But for Mr. Cemal's two health problems, they would still today be making ends meet as they were before November 2000. The Cemals' inability to pay their debts as they matured, although

delayed, was proximately caused by Mr. Cemal's two illnesses.

### Nature of Transactions

*Did the debtors incur cash advances and make consumer purchases far in excess of their ability to repay them?* The next factor to be considered is whether the debtors incurred cash advances and made consumer purchases far in excess of their ability to repay. The United States Trustee argued that:

> The debtors' Schedule F speaks for itself. The present case appears to be one involving individuals who, for whatever reason, have overextended their ability to meet their current obligations. The debtors voluntarily incurred consumer debts beyond their ability to pay them and the discretionary gambling, food, and other expenditures so demonstrate.

Motion at 7.

The difficulty of the United States Trustee's argument is that it is simply not supported by the facts. While Schedule F says that there are significant debts, it says nothing more. It does not explain why the Cemals became overextended. A significant income and significant debts do not necessarily equate with purchases made by the debtors far in excess of their ability to repay them.[24] In this case, the debts are debts of a lifetime. Their financial history reveals that Mrs. Cemal brought significant debts, from her first marriage and the period when she was a single mother, to this marriage. The

debts arose from Mr. Cemal's unemployment when Mrs. Cemal was reassigned to various foreign posts, and from the circumstances surrounding Mr. Cemal's health problems. The United States Trustee, who bears the burden of proof to prove substantial abuse, held an inch-thick stack of the Cemals' credit card statements in his hand when he examined Mrs. Cemal as to how many trips they had made to Atlantic City during the 18–month period of the statements. He went through the statements and counted six trips. He never questioned her about luxury goods purchased during this period. He never sought to show that there were numerous purchases on those statements. He never sought to show that the debtors had failed to schedule personal property on Schedule B paid for with credit and purchases. He never sought to introduce the credit card statements into evidence. If the credit card statements had been damaging to the Cemals, if they had shown numerous purchases beyond the Cemals' ability to pay, the court believes that the United States Trustee would have sought to introduce the credit card statements into evidence. Since he did not, it is fair to conclude that they showed no such thing.

Exhibit L was the debtors' summary of the credit card activity from October 2001 through October 2003. It shows the opening balances as of October 2001, new charges, payments made, fees imposed, interest charged and the closing balance in October 2003. It reflects:[25]

---

**24.** This factor is generally significant when large expenditures are made within a short period prior to the filing of a petition in bankruptcy, particularly if the consumer goods purchased do not show up on the debtor's schedule of personal property. All agree that this is not such a case.

**25.** The totals in the exhibit are not correct. The most significant error is in the grand total

for the interest. The exhibit states that it is $25,743.88. The column actually totals $42,628.98 which is shown in the table above. The balance for each credit card's October 2003 balance is incorrect on Exhibit L, but is corrected here. The total October 2003 balance given was $173,630.12. The court computed the total to be $176,241.64. The court assumed that the individual entries were correct and that the totals were incorrect. While

| | |
|---|---|
| October 2001 Balance | $164,143.11 |
| New Charges | $ 18,104.21 |
| Fees | $ 5,797.34 |
| Interest | $ 42,628.98 |
| Payments | $ 54,432.00 |
| October 2003 Balance | $176,241.64 |

Mrs. Cemal's testimony corroborates the essence of this summary. Payments exceeded new charges but were less than the new charges plus accrued interest. Minimum payments were not maintained.[26] The exhibit lists each credit card individually. Nine had no charges. There were eight credit cards with new purchases during the period. If there had been no new charges during this period, the outstanding balance would have decreased over the two-year period by $6,005.68, about 3.6%. A review of the credit card statements would have provided more precise evidence on this point.

If this *Green*-factor is broadly interpreted, all debtors start out with one factor weighing against them. All debtors have incurred obligations in excess of their ability to repay them. The very fact that debtors file bankruptcy is evidence of this. Such a broad interpretation is contrary to the presumption in favor of relief contained in § 707(b) itself. This factor is more properly an examination of the nature of the debtors incurred and of the debtor's reasonable expectations at the time that the obligations were incurred. Did he have a reasonable expectation of paying the obligation, or repaying the debt? Were the obligations for luxury goods or services? Were they consistent with the debtors' financial status in the community? Was there a sudden unexplained change in spending patterns? The

questions are directed to the fundamental purpose of § 707(b), whether the bankruptcy system is being used by a debtor "to take *unfair* advantage of his creditors." *Green*, 934 F.2d at 570 (emphasis added).

Rather than showing feckless, irresponsible consumers needlessly running up debt that they could ill afford and had no intention of repaying, the evidence fairly shows two individuals who used credit cards over their lifetime to make ends meet when times were difficult. They had the intention and expectation of repaying them and were successful in this endeavor from 1983 through 2000 when illness stretched their finances beyond the breaking point and the collapse slowly began. After Mrs. Cemal came to the realization that things were out of control, the debtors did not run up the balances. Instead, they sought help, pulled all of their equity out of their home and withdrew money from her retirement account. The credit cards were used as intended—for ordinary everyday purchases and to tide the debtors over in difficult times. There was no unfair advantage taken by the Cemals of their creditors.

The Cemals' expectation was not unreasonable. Until illness struck, they did have the ability to service the debt on a current basis. Credit card companies regularly review cardholder's credit reports. Confirming the Cemals' reasonable expectation, there was no testimony that any of the 18 credit card companies cancelled or curtailed any credit card account before the Cemals defaulted. Indeed, they were able to refinance their home twice after

---

these errors are troubling, the point made by the chart is corroborated by Mrs. Cemal's testimony.

**26.** This is consistent with Mrs. Cemal's description of the Debt Rescue program. If

minimum payments were 2% of the outstanding balance and the outstanding balance was a constant $164,143.11, the total required minimum payments would have been $78,788.64 over 24 months.

2000, once on August 26, 2002 and again on April 3, 2003.

Schedule F says that the Cemals incurred a lot of debt, but neither Schedule F nor the evidence presented indicate that at the time the debt was incurred that the Cemals did not intend to pay it or did not have the expectation that they could make their monthly payments as they matured. Nor is there any evidence that the debt was incurred for luxury goods or services. Despite the magnitude of the debt, this factor weighs in favor of the debtors.[27]

### Accuracy of Schedules

**Do the debtors' schedules and statement of current income and expenses reasonably and accurately reflect their true financial condition?** Another factor suggested by *Green* is whether the debtors' schedules and statement of current income and expenses reasonably and accurately reflect their true financial condition. With the few exceptions noted to Schedules I and J, the United States Trustee did not challenge the accuracy of the schedules or statements. Most of the objections raised by the United States Trustee were directed not to how the Cemals actually spent their money, but to how they ought to spend it. That is, they related more to his belt tightening argument than the accuracy of the schedules themselves. While belt-tightening is an appropriate line of inquiry to determine whether there is income available to pay creditors and if so, how much, it has less relevance on an inquiry relating to accuracy.

The evidence does show that the food expense was overstated on the original Schedule J. It was reduced from $1,600 on the original Schedule J to $1,290 on the amended Schedule J. Even the amendment somewhat overstates the expense. However, overall, the schedules and statements were reasonably accurate and do fairly reflect the debtors' financial affairs. There is no indication that the debtors attempted to manipulate the schedules or have not been forthcoming.

One change in Schedule I should be noted. Mr. Cemal reduced his income from a gross of $3,996.63 to $3,362.66. The court is satisfied that this is a fair and accurate change. Mr. Cemal testified that at the time he filed the original Schedule I he was compensated on a commission basis. His income was not consistent. It varied with the amount of work that needed to be done. It was, he testified, like "going fishing." Some days he sat around the garage all day and did nothing; other days he worked every minute he was there. He and his employer changed his compensation to an hourly basis to eliminate the variability in his paychecks. His current compensation is less, but predictable. In addition, he now has two weeks of paid vacation a year, although he still has no sick leave. The Statement of Financial Affairs reflect that Mr. Cemal's income in 2002 was $46,343 and in 2001 was $40,594. His W–2 for 2003 shows income of $47,131.91, which averages $3,927.66 per month, slightly less than what he scheduled on Schedule I. In 2003, Mr. Cemal earned about $23.00 an hour based on a 2080–hour work year.[28] His new compen-

27. All of the details of the debtors' financial history were not developed. In particular, the loan repayments from the refinances confirm that other debt was paid, but it is not clear when or why that debt was incurred or what that would mean in this case. The burden of proof is on the United States Trustee. If neither party thought it was signifi-cant, the court cannot consider it without entering the realm of speculation.

28. The court recognizes that the use of a 2080–hour work year does not tell the whole story. While on commissions, Mr. Cemal was present at the garage all day so that he was available to repair cars if any came in. He

sation is $20.00 an hour. Using the same analysis, his hourly rate was $22.28 in 2002 and $19.51 in 2000. The new hourly rate appears to be reasonable from both the employer's and the employee's perspective. It does not appear to be an attempt by Mr. Cemal to manipulate his income.

### Good Faith

***Was the petition filed in good faith?*** The United States Trustee does not assert that the petition was filed in bad faith. He does raise the issue of Mrs. Cemal's intended retirement in 2005. This was addressed earlier in connection with whether the Cemals' income was likely to continue into the future. It also has elements of good faith. Those additional considerations need to be addressed.

The United States Trustee's argument is that Mrs. Cemal should not retire in 2005 but should continue to work for the State Department for at least the duration of a chapter 13 plan. The issue is one of voluntary underemployment. While it can be addressed when reviewing a debtor's ability to pay, it also has overtones of bad faith. A debtor ought not be able to avoid his obligations to his creditors by voluntarily being underemployed for a period of time. It is a situation within the control of the debtor and that is being manipulated by the debtor to the disadvantage of his creditors. A debtor in such circumstances seeks to take unfair advantage of his creditors and to unfairly shield himself from his creditors through the abuse of the bankruptcy system.

The facts recited above demonstrate that Mrs. Cemal's decision to retire after 35 years of government service is not un-

reasonable and is not intended to take unfair advantage of her creditors. The precipitating cause of her retirement is an employer-imposed requirement that she relocate abroad. Without chapter 7 bankruptcy relief her financial circumstances do not permit such an assignment. As discussed above, her creditors would not benefit from a chapter 13 plan if she were to accept such an assignment and attempt a chapter 13 plan.

That does not, however, end the analysis. She is still capable of working and her job prospects after retirement from the government were discussed above. Mrs. Cemal testified as to some preliminary thoughts, none of which would normally be expected to produce income sufficient to pay her creditors. Her retirement is more than 15 months away. It is not reasonable to expect that she could negotiate a position this far in advance. It would have been helpful to have had a more definitive analysis of her job prospects. However, the burden of proof of substantial abuse is on the United States Trustee. He objected to her retirement. She has successfully shown that it is a reasonable decision that is not unfair to her creditors. Neither side has gone beyond that initial analysis. Given the United States Trustee's burden of proof and the statutory presumption in favor of the debtors' requested relief, the court finds that the Cemals have acted in good faith.

This conclusion is further supported by the debtors' consistent effort to repay their debts. They refinanced their home a number of times and took money out of the refinances to pay their debts. They bor-

---

also worked late if there was work to be done. Since he was on commissions, the extra hours did not result in extra pay. Using a 2080–hour work year probably understates the number of hours Mr. Cemal spent at work, the number of hours he was either waiting for

cars to repair or actually repairing cars. Consequently, it probably overstates the computed hourly rate for 2001–2003. It may also understate his 2004 salaried income because it does not consider any overtime hours.

rowed against her retirement program to pay their debts. Until they encountered health difficulties, they made all of their payments according to the contractual terms. They expected to be able to honor their contractual obligations. When they found that they could no longer do so, they sought help through credit counseling agencies and paid substantial sums to creditors through these agencies and for the agencies' fees. That assistance was unsuccessful. As a last resort, they sought relief under the Bankruptcy Code.

### Conclusion

Substantial abuse cases such as this one are difficult and close cases. *See In re Norris*, 225 B.R. at 334. Reasonable people can reach differing results. Both the United States Trustee and debtors' counsel are competent and reasonable attorneys. They argue from the same facts and the same controlling case law. They speak the same words. They ostensibly use the same analysis. But, the court senses that they are really poles apart. It is difficult to articulate the difference. The United States Trustee's underlying focus is principally on the feasibility of a chapter 13 plan. Although he does not present his case in these words, the evidence presented and the arguments made are more attuned to proving that the debtors could formulate a meaningful chapter 13, obtain confirmation and successfully complete it. The debtors candidly admit, as they must, that there is net disposable. However, their underlying focus is principally on whether their circumstances and the relief they seek is a substantial abuse of chapter 7 of the Bankruptcy Code. These are two different approaches.

■■■ The Fourth Circuit has held that no single factor including the ability of the debtors to repay their debts is determinative in a § 707(b) hearing. *Green*, 934 F.2d at 572. The burden of proof lies with the United States Trustee. There is a presumption in favor of the relief requested by the debtor. The Court of Appeals adopted "the totality of the circumstances test as the appropriate analysis to be followed in determining whether substantial abuse exists." *Id.* at 573. On remand, it suggested that the bankruptcy court consult several cases to assist it in its determination. The court stated:

> In making a judgment on the question of substantial abuse, the court may find it helpful to consult the following cases: *In re Grant*, 51 B.R. 385, 396 (Bankr.N.D.Ohio 1985) (citing debtor's "freewheeling spending," which included monthly entertainment expenses of $450 and Christmas expenditures of $900); *In re Peluso*, 72 B.R. 732, 738 (Bankr.N.D.N.Y.1987) (debtor with substantial income altered his monthly obligations in statements to the court at least three times; filing of petition was not precipitated by any injury, illness, or loss of employment); *In re Shands*, 63 B.R. 121, 123 (Bankr.E.D.Mich.1985) (debtor's choice of Chapter 7 over Chapter 13 was not motivated by inability to afford repayment but by some personal motive, where debtor was voluntarily paying favored creditors a weekly amount greater than her claimed excess income).

*Id.*

In *Grant*, the bankruptcy court closely examined the debtors' income and expenses. It found that the debtors could fund a 68% repayment plan over five years, which would be a 41% repayment plan over three years. *In re Grant*, 51 B.R. at 388. This was without considering a significant income tax refund and the husband's likely salary increases. The debtors' pre-petition purchases "exhibit the extravagance of their life-style, and

utter disregard of sound financial planning." *Id.* at 388. The court characterized the debtors' proposed post-petition budget as "free-wheeling sending [that] is likely to put the debtor in need of additional relief after several years." *Id.* at 396. The sense conveyed is one of irresponsible, feckless consumers whose life-style was funded by unsuspecting creditors. For example, they had leased a 1982 240D Mercedes but, despite their apparent financial distress, had recently replaced it with two new leased cars, both 1985 models. (The bankruptcy was filed on February 7, 1985.) No effort had been made to curb their spending. No effort had been made to pay their creditors. Their schedules were inaccurate.

*Peluso* contains similar elements as *Grant.* The court examined how the debtor spent his money. The debtor was making voluntary payments for the benefit of his adult children and to protect a co-signer on a promissory note. *In re Peluso*, 72 B.R. at 738. He changed his schedule of monthly expenditures three times during the course of the case. *Id.* The expenditures were still overstated, and if reduced could have funded a chapter 13 plan that would have paid his creditors in full over five years. *Id.* at 739. A 36–month plan would have resulted in a 60% distribution to creditors. "The bottom line is that Debtor voluntarily incurred consumer debts beyond his ability to pay them. This destructive financial pattern does not appear to have an end in sight." *Id.* at 738.

*Peluso* focused not only on the debtor's ability to fund a chapter 13 plan. It also found that the schedules of income and expense were inaccurate and that there were voluntary payments which suggest in addition to the finding that there was an ability to pay that there was an absence of good faith. There were *no* unexpected expenses or calamities and, therefore, no explanation as to how the debtor came to be in his financial straits.

*Shands* presents a different scenario. Here the debtor had the ability to repay all of her debts within 33 months, however, she did not want to pay a debt to her former husband. In fact, she and her present husband had borrowed $19,000 from their credit union to payoff almost all of their debts. That loan was being paid from her present husband's paycheck by an allotment. She had only two small debts. *In re Shands*, 63 B.R. at 122. Shortly, after they borrowed the $19,000, Mrs. Shands' former husband demanded payment of $6,000 which he said was due to him from their divorce settlement. She was unhappy that their home had gone to foreclosure, blamed him and felt that he had lost the equity, half of which would have gone to her. She waited for the preference period to expire on the $19,000 loan before she filed bankruptcy. Her former husband filed a non-dischargeability complaint. In her answer she stated that "The Debtor does admit that the main purpose of filing her bankruptcy was to discharge her debt to her former husband." *Id.* at 123. The bankruptcy was dismissed for substantial abuse. *Id.* at 124; *See also In re Kestell*, 99 F.3d 146 (finding substantial abuse where debtor sought to avoid paying former wife while paying all other financial obligations). In both cases there was clear bad faith.

*Green* has been applied in more recent cases. *In re Stewart* is one. In this case, the debtor sought to discharge significant obligations to his former wife and her parents. The debtor had graduated from medical school and was in a fellowship program. He earned $35,000 a year but had clear prospects of increasing that to several hundred thousand dollars a year. While the bankruptcy followed the debtor's

divorce, there were no decline in income. He elected to enter a fellowship program that reduced his current income quite significantly but promised to increase his future income quite significantly. The debts to his former wife and her parents had been incurred to support them during his education. The Bankruptcy Appellate Panel affirmed the bankruptcy court's dismissal for substantial abuse. Here, there was voluntary underemployment that was intended to be temporary. The debtor's future ability to repay all his debts was well established and those debts had been incurred in an effort to permit him to realize his ambition and his future income.

The last case to be considered is *In re Norris*. There are similarities between *Norris* and this case. In *Norris*, the court considered each of the *Green* factors. It concluded that the debtor could support a 47% repayment plan in a 3–year chapter 13 plan. It found that the debtors' filing was not caused by unforeseen calamities. It found that the debts had been mounting for a decade but noted that two years before the filing that Mr. Norris's income had dropped from $70,000 to $48,000 when his employer's business was purchased. The new owner changed his compensation package from a commission basis to a salary basis with the resulting loss in income. Unlike this case, the court did not relate that income loss to the present filing. It was concerned that although the debtor could have moved to a less expensive home, they decided not to do so.[29] As a result, they were discharging all of their

unsecured creditors while paying their secured creditor. There was some, but not significant, concern over the accuracy of the debtors' schedules. The credit card debt was about $90,000, "most of which resulted from using one credit card to pay off another, while using still other cards to pay for living expenses." *In re Norris*, 225 B.R. at 333. During this time, there was no end in sight to the debtors' spending habits. The budget remained excessive and unreasonable. The court did not find bad faith. The debtors did not run up a large amount of debt just prior to filing or lead an extraordinary lavish life-style. They did not manipulate their schedules or attempt to mislead the court. They had sought alternatives to bankruptcy. Overall, the court was "left with a rather close decision." *Id.* at 334. It found that there was substantial abuse. *Id.*

In this case, the debtors have an ability to pay some of their debts, but the percentage of repayment is lower than in the cases discussed. In those cases, the 3–year repayment percentages were 41% (*Grant*), 47% (*Norris*), 60% (*Peluso*), and 100% (*Shands*).[30] The United States Trustee estimates that the percentage is about 30%. The debtors argue that it is less than 20%. Belt-tightening adds about 5% to the debtors' estimate. The elimination of the TSP loan and contribution would add another 5% and result in the United States Trustee's estimate. The treatment of the TSP loan in this case is ambiguous. Current repayment is not abusive, but it would not be allowed in

---

**29.** The house was described as "a large and expensive home." *In re Norris*, 225 B.R. at 333.

**30.** In *Grant* and *Peluso*, the bankruptcy courts used 5–year terms. Those repayment percentages were 68% (*Grant*) and 100% (*Peluso*). *Norris* used a 3–year term. The 3–year term is more appropriate for most substantial abuse motions. *Cf. Stewart.* For chapter 13

purposes, the usual plan term is three years. The court may approve up to a five-year term "for cause." 11 U.S.C. § 1322(d). This court computed the equivalent 3–year repayment percentages for *Grant* and *Peluso*. It is not clear what, if any, impact this reduced period would have had on the outcomes of those cases.

chapter 13. There has been no extravagant or lavish life-style. While the debt accumulated over a lifetime, it does not appear that there was a significant use of the credit cards to pay everyday expenses on a consistent basis as in *Norris*. It appears that much of the debt arose from periods of unemployment or illness. There was no sense that the debts would not or could not be paid over time. There is no evidence that one credit card was used to pay another one.

The debtors live modestly. Their home is not an expensive one for the area. They would have some difficulty finding alternative housing for much less than they are now paying.

The debtors have been honest with the court. Their schedules and statement of financial affairs are substantially accurate. They have acted in good faith in seeking remedies to their financial problems. Before resorting to bankruptcy they sought credit counseling and made significant efforts to successfully complete the programs.

This case is, as Judge Tice stated in *Norris*, a difficult and close case. However, in examining all the circumstances, the court is satisfied that the Cemals resort to chapter 7 is not a substantial abuse of the Bankruptcy Code. They are not taking unfair advantage of their creditors.

The United States Trustee's case relies too heavily on the ability of the debtors to repay their debt, the magnitude of their debts and their current income all without due consideration for the totality of the circumstances. If the magnitude of debt or current income were intended to be determining factors, Congress could easily have restricted chapter 7 relief to debtors with less than a certain debt level or income level, much as it has limited chapter 13 relief to certain debt levels. 11 U.S.C. § 109(e). *Green* teaches otherwise. The

Court of Appeals in *Green* rejected a standard that looked solely to the ability to pay creditors in favor of the totality of the circumstances. In criticizing *In re Kelly*, 841 F.2d 908 (9th Cir.1988), it noted that *Kelly* first stated that a debtor's ability to repay was a principal factor in determining substantial abuse but held that such an ability **standing alone** would justify dismissal under § 707(b). *Green*, 934 F.2d. at 572. "This logical leap is unsupported, for to say that a conclusion may be justified by a certain factor as the principal one of several does not imply that the conclusion may also be drawn from that factor alone." *Id.*

Congress expressly provided that there is "a presumption in favor of granting the relief requested by the debtor." 11 U.S.C. § 707(b). The Court of Appeals admonished:

> If the debtor, acting in good faith, preferred to effect the discharge by making extended payment to his creditors over time, presumably he would have filed under Chapter 13. The court may advise the latter, but the election remains with the debtor, a point underscored by Congress's explicit refusal to adopt a mandatory Chapter 13 provision.

*Green*, 934 F.2d at 573.

Here, the debtors acted in good faith. Over the last several years they sought to find a way to pay their debts. Through their refinances and use of debt counseling services, they essentially cobbled together a repayment plan that had characteristics similar to a chapter 13 plan. The effort failed. Their decision to now seek chapter 7 relief rather than chapter 13 relief is reasonable given all the circumstances existing today and likely to exist in the future. It does not take unfair advantage of their creditors.

The United States Trustee's motion will be denied.